# MAPLE FLOORING MANUFACTURERS ASSN. ET AL. *v.* UNITED STATES.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF MICHIGAN.

No. 342.  Argued December 1, 2, 1924; reargued March 3, 1925.—
Decided June 1, 1925.

1. In a suit to enjoin a trade association under the Anti-Trust Act
   in which the Government adduced, as evidence of guilty purpose,
   the history of earlier combinations which this one had superseded,
   *held* that there was no evidence of any present agreement or pur-
   pose to produce any effect on commerce other than that which
   necessarily would flow from the activities of the present associa-
   tion, and that the only question was whether that association, as
   actually conducted, had a necessary tendency to cause direct and
   undue restraint of competition condemned by the Act.  P. 577.

2. Each case arising under the Sherman Act must be determined upon
   the particular facts disclosed by the record; and opinions of the
   Court in those cases must be read and applied in the light of their
   facts, with clear recognition of essential differences in that regard.
   P. 579.

3. Trade associations or combinations of individuals or corporations,
   which, as in this case, openly and fairly gather and disseminate
   information as to the cost of their product, the actual prices it
   has brought in past transactions, stocks on hand and approximate
   cost of transportation from the principal point of shipment to
   points of consumption, and meet and discuss such statistics without
   reaching or attempting to reach any agreement or concerted action
   respecting prices, production or the restraining of competition, do
   not thereby engage in an unlawful restraint of commerce.  P. 582.

4. In a suit under the Anti-Trust Act to dissolve a trade association
   formed by numerous manufacturers of hard-wood flooring, the
   following activities were complained of: (1) Computation and dis-
   tribution among the members of information as to the average
   cost of their products, based (a) on cost of raw material as ascer-
   tained and averaged by the association's secretary from reports of
   actual sales of rough lumber by members in open market, (b) on
   manufacturing costs ascertained through questionnaires sent the
   members, and (c) on percentage of waste in milling, ascertained
   through test runs made by selected members under direction of

the secretary; (2) compilation and distribution among them of booklets showing freight rates from a basing point to numerous points to which their products were shipped, enabling members to quote delivered prices promptly; (3) gathering by periodical reports from members of information as to the quantity and kind of flooring sold by them, dates of sales and prices received, average freight rates, commissions paid, amount and kinds of stock on hand, and of unfilled orders, monthly production and new orders booked; which information, embracing only past and closed transactions and omitting names of purchasers, current prices and many other details, was transmitted in summarized form to the members by the secretary of the association, without, however, revealing the identity of members in connection with specific information transmitted, and was given wide publicity through publication in trade journals, communication to the Department of Commerce, etc.; (4) monthly meetings at which problems of the industry were discussed, without discussion or agreement upon prices. *Held* that such activities did not constitute an unlawful restraint on commerce. *Am. Column Lumber Co.* v. *United States*, 257 U. S. 377; *United States* v. *Am. Linseed Oil Co.*, 262 U. S. 371, distinguished. P. 568.

Reversed.

APPEAL from a decree of the District Court awarding an injunction, in a suit brought by the Government under the Anti-Trust Act against a combination, in the form of a trade association, of manufacturers of hardwood flooring lumber.

*Mr. Edward R. Johnston,* with whom *Messrs. Jacob Newman, Conrad H. Poppenhausen, Henry L. Stern,* and *Henry Jackson Darby* were on the brief, for appellants.

*Mr. J. A. Fowler,* Special Assistant to the Attorney General, with whom the *Solicitor General* and *Mr. C. S. Thompson,* Special Assistant to the Attorney General, were on the brief, for the United States.

*Mr. Herbert Pope* filed a brief as *amicus curiae* for the National Malleable & Steel Castings Company, by special leave of Court.

MR. JUSTICE STONE delivered the opinion of the Court.

By bill in equity filed March 5, 1923, the United States asked an injunction restraining the defendants, who are appellants here, from violating § 1 of the Act of Congress of July 2, 1890, entitled, "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies" (c. 647, 26 Stat. 209), commonly known as the Sherman Act.

The defendants are the Maple Flooring Manufacturers Association, an unincorporated "trade association"; twenty-two corporate defendants, members of the Association, engaged in the business of selling and shipping maple, beech and birch flooring in interstate commerce, all but two of them having their principal places of business in Michigan, Minnesota or Wisconsin (one defendant being located in Illinois and one in New York); the several individual representatives of the corporate members of the Association; and George W. Keehn, Secretary of the Association. Of the corporate defendants, approximately one-half own timber lands and saw mills and are producers of the rough lumber from which they manufacture finished flooring, sold and shipped in interstate commerce. The other defendants purchase rough flooring lumber in the open market and manufacture it into finished flooring which is sold and shipped in interstate commerce. In 1922 there were in the States of Illinois, Michigan, Minnesota and Wisconsin seventeen non-member manufacturers of maple, beech and birch flooring and there were fifty-eight non-member manufacturers of maple, beech and birch flooring in the United States who reported to the Government. In that year thirty-eight non-member manufacturers reported a manufacturing capacity of 238,610,000 feet of flooring of the types mentioned and during the same year the manufacturing capacity of the defendants was 158,400,000 feet. Estimates

submitted in behalf of the Government indicate that in the year 1922 the defendants produced 70% of the total production of these types of flooring, the percentage having been gradually diminished during the five years preceding, the average for the five years being 74.2%. It is also in evidence that aside from non-member manufacturers who reported to the Government, there are numerous other non-member manufacturers of such flooring in the United States and Canada. The defendants own only a small proportion of the total stand, in the United States, of maple, beech and birch timber from which the various types of flooring produced and sold by defendants are manufactured.

In March, 1922, the corporate defendants organized the defendant Maple Flooring Manufacturers Association, but for many years prior to that time and certainly since 1913 a substantial number of the corporate defendants have participated actively in maintaining numerous successive trade associations of the same name, which were predecessors of the present association. The oral testimony and documentary evidence have covered a wide range and have reached a great volume which it will be impossible, within the limits of an opinion, to review in detail. The defendants have engaged in many activities to which no exception is taken by the Government and which are admittedly beneficial to the industry and to consumers; such as co-operative advertising and the standardization and improvement of the product. The activities, however, of the present Association of which the Government complains may be summarized as follows:

(1) The computation and distribution among the members of the association of the average cost to association members of all dimensions and grades of flooring.

(2) The compilation and distribution among members of a booklet showing freight rates on flooring from Cadil-

.lac, Michigan, to between five and six thousand points of shipment in the United States. ·

(3) The gathering of statistics which at frequent intervals are supplied by each member of the Association to the Secretary of the Association giving complete information as to the quantity and kind of flooring sold and prices received by the reporting members, and the amount of stock on hand, which information is summarized by the Secretary and transmitted to members without, however, revealing the identity of the members in connection with any specific information thus transmitted.

(4) Meetings at which the representatives of members congregate and discuss the industry and exchange views as to its problems.

Before considering these phases of the activities of the Association, it should be pointed out that it is neither alleged nor proved that there was any agreement among the members of the Association either affecting production, fixing prices or for price maintenance. Both by the articles of association and in actual practice, members have been left free to sell their product at any price they choose and to conduct their business as they please. Although the bill alleges that the activities of the defendants hereinbefore referred to resulted in the maintenance of practical uniformity of net delivered prices as between the several corporate defendants, the evidence fails to establish such uniformity and it was not seriously urged before this Court that any substantial uniformity in price had in fact resulted from the activities of the Association, although it was conceded by defendants that the dissemination of information as to cost of the product and as to production and prices would tend to bring about uniformity in prices through the operation of economic law. Nor was there any direct proof that the activities of the Association had affected prices adversely to consumers. On the contrary, the defendants offered a great volume of evidence tending to show that the trend of

prices of the product of the defendants corresponded to the law of supply and demand and that it evidenced no abnormality when compared with the price of commodities generally. There is undisputed evidence that the prices of members were fair and reasonable and that they were usually lower than the prices of non-members and there is no claim that defendants were guilty of unfair or arbitrary trade practices.

The contention of the Government is that there is a combination among the defendants, which is admitted; that the effect of the activities of the defendants carried on under the plan of the Association must necessarily be to bring about a concerted effort on the part of members of the Association to maintain prices at levels having a close relation to the average cost of flooring reported to members and that consequently there is a necessary and inevitable restraint of interstate commerce and that therefore the plan of the Association itself is a violation of § 1 of the Sherman Act which should be enjoined regardless of its actual operation and effect so far as price maintenance is concerned. The case must turn therefore, on the effect of the activity of the defendants in the gathering and dissemination of information as to the cost of flooring, since, without that, the other activities complained of could have no material bearing on price levels in the industry; and it was to this phase of the case that the oral argument was mainly directed.

Having outlined the substantial issues in the case, it will now be convenient to examine more in detail the several activities of the defendants of which the Government complains.

*Computation and distribution, among the members, of information as to the average cost of their product.*

There are three principal elements which enter into the computation of the cost of finished flooring. They are

the cost of raw material; manufacturing cost and the percentage of waste in converting rough lumber into flooring. The information as to the cost of rough lumber was procured by the Secretary from reports of actual sales of lumber by members in the open market. From five to ten ascertained sales were taken as standard and the average was taken as the estimated cost of raw material. Manufacturing costs were ascertained by questionaires sent out to members by which members were requested to give information as to labor costs, cost of warehousing, insurance and taxes, interest at 6% on the value of the plant, selling expense, including commissions and cost of advertising, and depreciation of plant. From the total thus ascertained there was deducted the net profit from wood and other by-products. The net total cost thus ascertained of all members reporting was then averaged.

The percentage of waste in converting the rough lumber into flooring was ascertained by test runs made by selected members of the Association under the direction of the Secretary of the Association, in the course of which a given amount of rough lumber was converted into flooring of different sizes and the actual waste in the process ascertained and stated in terms of percentage. By combining the three elements of cost thus arrived at, the total cost per thousand feet of the aggregate of the different types and grades of flooring produced from a given amount of rough lumber was estimated. To this cost there was at one time added an estimated 5% for contingencies, which practice, however, was discontinued by resolution of the Association of July 19, 1923. For the element of manufacturing and marketing cost, the first of these estimates prepared in the manner described was based upon an average of such cost for the first half of 1921. Other successive estimates were prepared on a like basis during the first, third and fourth quarter of the year 1922.

In order to determine the cost of a given type or grade of flooring, it was necessary to distribute the total cost of the aggregate of the different types and grades of finished flooring produced from a given amount of rough lumber among the several types and grades thus produced. This distribution was made by the officials of the Association and the estimated cost thus determined was tabulated and distributed among the members of the Association. There is no substantial claim made on the part of the Government that the preparation of these estimates of cost was not made with all practicable accuracy or that they were in any respect not what they purported to be, an estimate of the actual cost of commercial grades of finished flooring fairly ascertained from the actual experience of members of the Association, except that the point is made by the Government that the distribution of cost among the several types and grades of finished flooring produced from a given amount of rough lumber was necessarily arbitrary and that it might be or become a cover for price fixing. Suffice it to say that neither the Government nor the defendants seem to have found it necessary to prove upon what principle of cost accounting this distribution of cost was made and there are no data from which any inference can be drawn as to whether or not it conformed to accepted practices of cost accounting applied to the manufacture of a diversified product from a single type of raw material.

*The compilation and distribution among members of information as to freight rates.*

Through the agency of the Secretary of the Association a booklet was compiled and distributed to members of the Association showing freight rates from Cadillac, Michigan, to numerous points throughout the United States to which the finished flooring is shipped by members of the

Association. It appears from the evidence to have been the usual practice in the maple flooring trade, to quote flooring at a delivered price and that purchasers of flooring usually will not buy on any other basis. The evidence, however, is undisputed that the defendants quote and sell on an f. o. b. mill basis whenever a purchaser so requests. It also appears that the mills of most of the members of the Association are located in small towns in Michigan and Wisconsin and that the average freight rates from these principal producing points in Michigan and Wisconsin to the principal centers of consumption in the United States are approximately the same as the freight rate from Cadillac, Michigan, to the same centers of consumption. There is abundant evidence that there were delays in securing quotations of freight rates from the local agents of carriers in towns in which the factories of defendants are located, which seriously interfered with prompt quotations of delivered prices to customers; that the actual aggregate difference between local freight rates for most of defendants' mills and the rate appearing in defendant's freight-rate book based on rates at Cadillac, Michigan, were so small as to be only nominal, and that the freight-rate book served a useful and legitimate purpose in enabling members to quote promptly a delivered price on their product by adding to their mill price a previously calculated freight rate which approximated closely to the actual rate from their own mill towns.

The Government bases its criticism of the use of the freight-rate book upon the fact that antecedent associations, maintained by defendants, incorporated in the freight-rate book a delivered price which was made up by adding the calculated freight rate from Cadillac, Michigan, to a minimum price under the so-called " minimum price plan " of previous associations, whereby the price was fixed at cost plus ten per cent. of profit. It is conceded

that the present Association does not include a delivered price in the freight-rate book, but it is urged by the Government that the circulation of the tables of estimated cost of flooring, together with a freight-rate book, enables members of the Association to fix a delivered price by adding to the estimated cost circulated among members, the calculated freight rate published in the freight-rate book, and that the freight-rate book used in conjunction with the published material as to estimated cost is merely a device whereby the defendants have continued the so-called minimum price plan formerly maintained by predecessor associations, which was a plan whereby the members co-operated in the maintenance of a fixed minimum price. Defendants maintain that the minimum price plan was never actually carried out by any predecessor association and that it was formally abandoned in February or March, 1920, after the failure to secure the approval of the plan by the Federal Trade Commission, and was never revived or continued.

It cannot, we think, be questioned that data as to the average cost of flooring circulated among the members of the Association when combined with a calculated freight rate which is either exactly or approximately the freight rate from the point of shipment, plus an arbitrary percentage of profit, could be made the basis for fixing prices or for an agreement for price maintenance, which, if found to exist, would under the decisions of this Court, constitute a violation of the Sherman Act. But, as we have already said, the record is barren of evidence that the published list of costs and the freight-rate book have been so used by the present Association. Consequently, the question which this Court must decide is whether the use of this material by members of the Association will necessarily have that effect so as to produce that unreasonable restraint of interstate commerce which is condemned by the Sherman Act.

*The gathering and distributing among members of trade*
*statistics.*

It is contended by the Government that an analysis of
the reporting system adopted by the defendants shows
that there is no information withheld by one member
from another, and that every member is perfectly familiar
not only with the summaries which show the exact market
condition generally, but also with the exact condition of
the business of each of his fellow members. An examina-
tion of the record discloses that this is not an accurate
statement of the statistical information distributed among
members of the Association, certainly not within any
recent period of the history of the successive associations.
At the time of the filing of the bill, members reported
weekly to the Secretary of the Association on forms show-
ing dates of sales made by the reporting member, the
quantity, the thickness and face, the grade, the kind of
wood, the delivery, the prices at which sold, the average
freight rate to destination and the rate of commission
paid, if any. Members also reported monthly the amount
of flooring on hand of each dimension and grade and the
amount of unfilled orders. Monthly reports were also re-
quired showing the amount of production for each period
and the new orders booked for each variety of flooring.
The Association promptly reported back to the members
statistics compiled from the reports of members including
the identifying numbers of the mills making the reports,
and information as to quantities, grades, prices, freight
rates, etc., with respect to each sale. The names of pur-
chasers were not reported and from and after July 19,
1923, the identifying number of the mill making the re-
port was omitted. All reports of sales and prices dealt
exclusively with past and closed transactions. The
statistics gathered by the defendant Association are given
wide publicity. They are published in trade journals

which are read by from 90 to 95% of the persons who purchase the products of Association members. They are sent to the Department of Commerce which publishes a monthly survey of current business. They are forwarded to the Federal Reserve and other banks and are available to anyone at any time desiring to use them. It is to be noted that the statistics gathered and disseminated do not include current price quotations; information as to employment conditions; geographical distribution of shipments; the names of customers or distribution by classes of purchasers; the details with respect to new orders booked, such as names of customers, geographical origin of orders; or details with respect to unfilled orders, such as names of customers, their geographical location; the names of members having surplus stocks on hand; the amount of rough lumber on hand; or information as to cancellation of orders. Nor do they differ in any essential respect from trade or business statistics which are freely gathered and publicly disseminated in numerous branches of industry producing a standardized product such as grain, cotton, coal oil, and involving interstate commerce, whose statistics disclose volume and material elements affecting costs of production, sales price and stock on hand.

### Association Meetings.

The Articles of the defendant Association provide for regular meetings for the transaction of business on the third Wednesday of April, July and October of each year, and that special meetings may be called by the President or a majority of the Board of Trustees. During the year in which the bill of complaint was filed meetings appear to have been held monthly. Minutes of meetings were kept, although it is not contended that they constituted a complete record of the proceedings. Trade conditions generally, as reflected by the statistical information dis-

seminated among members, were discussed; the market prices of rough maple flooring were also discussed, as were also manufacturing and market conditions. Those members who did not produce rough flooring lumber improved the occasion of the monthly meetings to secure purchases of this commodity from other members. The testimony is explicit and not denied that, following the decision in *United States* v. *American Linseed Oil Co.,* 262 U. S. 371, (June, 1923) there was no discussion of prices in meetings. There was no occasion to discuss past prices, as those were fully detailed in the statistical reports, and the Association was advised by counsel that future prices were not a proper subject of discussion. It was admitted by several witnesses, however, that upon occasion the trend of prices and future prices became the subject of discussion outside the meeting among individual representatives of the defendants attending the meeting. The Government, however, does not charge, nor is it contended, that there was any understanding or agreement, either express or implied, at the meetings or elsewhere, with respect to prices.

Upon this state of the record, the District Court, from whose decision this appeal was taken, held that the plan or system operated by the defendants had a direct and necessary tendency to destroy competition; that the methods employed by them had at all times a controlling influence to impeding the economic laws of supply and demand, and tending to increase prices, and to stifle competition; that the plan of the Association was therefore inherently illegal; that in consequence the actual results flowing from such a plan and the execution of it are of secondary importance. The court accordingly decreed the dissolution of the defendants' association and enjoined them from engaging in activities complained of by the Government. In arriving at this result it was admitted that it was impossible to measure, either accurately or

even approximately, the effect of the activities of the defendants upon prices, production and competition in the flooring industry, for the reason that there could be, in the nature of things, no satisfactory standards of comparison. The court found no agreement to fix prices and that in fact lower prices have usually been quoted by members than by non-members of the Association. In reaching its conclusion, the court relied principally upon the necessary tendency or effect of the plan actually in operation and upon the past history of the Association and its predecessors as indicating a probable purpose on the part of the members of the Association to use the plan as a medium for effecting actual and undue restraint on interstate commerce, and it is urged here that the history of the successive Associations organized by the members of the defendant Association, or a majority of them, establishes a systematic purpose on the part of the corporate defendants to restrain interstate commerce.

It is pointed out that the Articles of the Association of January 1, 1913, embodied the so-called "allotment plan," which provided for an allotted percentage of the aggregate shipments of all members within a given period, to each member, with a provision for payment of a bonus or allowance to each member which did not make its full allotment or percentage of shipments. This plan was abandoned in March, 1920. On July 1, 1916, the Articles of Association of that date adopted a minimum price plan which it is claimed continued in effect until about January 1, 1921. This plan contemplated the establishment of a minimum price of maple, beech and birch flooring by members of the Association, such prices to consist of the average cost and expense of manufacturing and selling the product, plus an average profit of ten per cent. The plan provided drastic penalties for the sale of flooring at less than the minimum price so established. It is also charged that on January, 1921, the defendants, by agree-

ment, established a minimum price basis for the sale of flooring for the ensuing year. Under this plan the average net profit was reduced from ten to five per cent. and penalties for non-compliance with the minimum price scale were abolished.

It is conceded, however, that each of these several plans was abandoned and that the present Association, both by the terms of its Articles of Association and in actual practice, has confined itself to the activities which have already been described in some detail.

We think it might be urged, on the basis of this record, that the defendants, by their course of conduct, instead of evidencing the purpose of persistent violators of law, had steadily indicated a purpose to keep within the boundaries of legality as rapidly as those boundaries were marked out by the decisions of courts interpreting the Sherman Act. Whether, however, their general purpose was to become law-abiding members of the community or law breakers, it is not, we think, very material unless the court either can infer from this course of conduct a specific and continuing purpose or agreement or understanding on their part to do acts tending to effect an actual restraint of commerce (*United States* v. *United States Steel Corp'n,* 251 U. S. 417), or unless, on the other hand, it is established that the combination entered into by the defendants in the organization of the defendant Association, and its activities as now carried on, must necessarily result in such restraint. As already indicated, the record is barren of evidence tending to establish that there is any agreement or purpose or intention on the part of defendants to produce any effect upon commerce other than which would necessarily flow from the activities of the present Association, and in our view the Government must stand or fall upon its ability to bring the facts of the present case within the rule as laid down in *American Column Co.*

v. *United States,* 257 U. S. 377, where it was said, at
p. 400:

"It has been repeatedly held by this Court that the
purpose of the statute is to maintain free competition in
interstate commerce and that any concerted action of men
or corporations to cause, or which in fact does cause, direct
and undue restraint of competition in such commerce falls
within the condemnation of the Act and is unlawful";
and within the rule laid down by the Court in *United
States* v. *American Linseed Oil Company,* 262 U. S. 371, at
'p. 390:

"In the absence of a purpose to monopolize or the com-
pulsion that results from contract or agreement, the indi-
vidual certainly may exercise great freedom; but con-
certed action through combination presents a wholly
different problem and is forbidden when the necessary
tendency is to destroy the kind of competition to which
the public has long looked for protection."

It should be noted that the bill of complaint neither
charges nor does the Government urge, that there was
any purpose on the part of the defendants to monopolize
commerce in maple, beech and birch flooring. It is not
contended that there was the compulsion of any agree-
ment fixing prices, restraining production or competi-
tion or otherwise restraining interstate commerce. In our
view, therefore, the sole question presented by this record
for our consideration is whether the combination of the
defendants in their existing Association, as actually con-
ducted by them, has a *necessary* tendency to cause direct
and undue restraint of competition in commerce falling
within the condemnation of the Act. In urging that such
is the necessary effect, the Government relies mainly upon
the decisions of this Court in *Eastern States Retail Lum-
ber Dealers Association* v. *United States,* 234 U. S. 600;
*American Column & Lumber Co.* v. *United States, supra,*
and *United States* v. *American Linseed Oil Company,
supra.*

It should be said at the outset, that in considering the application of the rule of decision in these cases to the situation presented by this record, it should be remembered that this Court has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied.

In *Eastern States Retail Lumber Dealers Association* v. *United States, supra,* the defendant members of the Association had entered into a combination and agreement whereby members were required to report to the Association the names of wholesale dealers in lumber who sold their product directly to consumers. The names of the offending wholesalers were placed upon a " black list " which was circulated among the members of the Association. The name of a blacklisted wholesaler could be removed from the list only on application to the secretary of the Association and on assurance that the offending wholesaler would no longer sell in competition with retailers. It was conceded by the defendants, and the court below found, that the circulation of this information would have a natural tendency to cause retailers receiving these reports to withhold patronage from listed concerns; that it therefore, necessarily, tended to restrain wholesalers from selling to the retail trade, which in itself was an undue and unreasonable restraint of commerce. Moreover, the court said, at p. 612:

" This record abounds in instances where the offending dealer was thus reported, the hoped for effect, unless he discontinued the offending practice, realized, and his trade directly and appreciably impaired."

There was thus presented a case in which the court could not only see that the combination would necessarily re-

sult in a restraint on commerce which was unreasonable, but where in fact such restraints had actually been effected by the concerted action of the defendants.

In *American Column & Lumber Co.* v. *United States, supra,* the defendant association adopted a plan for the gathering from its members daily and disseminating among them weekly, reports of all sales and shipments actually made, giving prices, names and addresses of purchasers, the kind, grade and quantity of commodity sold and shipped. Its plan provided for a monthly production report giving production of members during the previous month; a monthly stock report showing stock on hand on the first day of the month; current price lists, followed by prompt information as to new price quotations as made. Monthly meetings were held at which the extensive interchange of reports was supplemented by further exchange of information as to production, at which active and concerted efforts were made to suppress competition by the restriction of production. The secretary of the Association, in communications to members, actively urged curtailment of production and increase of prices. The record disclosed a systematic effort, participated in by the members of the Association and led and directed by the secretary of the Association, to cut down production and increase prices. The court not only held that this concerted effort was in itself unlawful, but that it resulted in an actual excessive increase of price to which the court found the "united action of this large and influential membership of dealers contributed greatly." The opinion of the court in that case rests squarely on the ground that there was a combination on the part of the members to secure concerted action in curtailment of production and increase of price, which actually resulted in a restraint of commerce, producing increase of price.

In *United States* v. *American Linseed Oil Co., supra,* defendants entered into an agreement, with provisions

'for financial forfeitures in event of· its violation, for the organization and maintenance of an exchange or bureau whose function it was to gather and distribute information among the members, as to all price lists covering the product of members. Members· agreed, under heavy penalties for violation, to furnish to the Bureau a " schedule of prices and terms and adhere thereto—unless more onerous ones were obtained—until prepared to give ' immediate notice of departure therefrom for relay by the Bureau to members." Members were required by the. agreement to report by telegraph all variations of prices; the names of prospective buyers; the point of shipment; the exact prices, terms and discounts; whether sales were made to jobber, or dealer or consumer; in what quantity; and to report also by telegraph all orders received; to report daily all carload sales of product, giving full details; all such information being treated as confidential and concealed from the buyers. All information received was made available to members through the statistical surveys of the Bureau. It was provided that any subscriber who had offered his product to a prospective buyer who did not purchase, should have the right to advise the Bureau of the unsuccessful offer and to request the Bureau to " bulletin " all its subscribers, asking· specific information regarding any quotations for sale to such prospective buyer, and to make to subscribers a compilation report of the information secured by such " bulletin." Members were required to give the desired information. Each subscriber was required to furnish the Bureau, upon request, information pertaining to any buyer of the product and . might request the Bureau to secure like information from all other subscribers " whenever it shall have an order or account with or inquiry from the buyer ". The plan as organized, was actively carried out by the defendants and the court held that the plan as operated by the defendants . was a violation of the Sherman Act in that " its necessary

tendency was to suppress competition in interstate com-
merce." It was held that the agreement for price main-
tenance accompanied by free exchange of information
between competitors as to current prices of the product
offered for sale; full details as to purchasers, actual and
prospective; and the exchange of information as to buyers
and those to whom offerings were made by sellers and of
the terms of such offerings, could necessarily have only
one purpose and effect, namely to restrain competition
among sellers. The court said, at p. 389:

"If, looking at the entire contract by which they are
bound together, in the light of what has been done under
it the Court can see that its necessary tendency is to sup-
press competition in trade between the States, the com-
bination must be declared unlawful. That such is its
tendency, we think, must be affirmed."

It is not, we think, open to question that the dissemina-
tion of pertinent information concerning any trade or
business tends to stabilize that trade or business and to
produce uniformity of price and trade practice. Exchange
of price quotations of market commodities tends to pro-
duce uniformity of prices in the markets of the world.
Knowledge of the supplies of available merchandise tends
to prevent over-production and to avoid the economic dis-
turbances produced by business crises resulting from over-
production. But the natural effect of the acquisition of
wider and more scientific knowledge of business condi-
tions, on the minds of the individuals engaged in com-
merce, and its consequent effect in stabilizing production
and price, can hardly be deemed a restraint of commerce
or if so it cannot, we think, be said to be an unreasonable
restraint, or in any respect unlawful.

It is the consensus of opinion of economists and of many
of the most important agencies of Government that the
public interest is served by the gathering and dissemina-
tion, in the widest possible manner, of information with

respect to the production and distribution, cost and prices
in actual sales, of market commodities, because the making
available of such information tends to stabilize trade and
industry, to produce fairer price levels and to avoid the
waste which inevitably attends the unintelligent conduct
of economic enterprise.   Free competition means a free
and open market among both buyers and sellers for the
sale and distribution of commodities.   Competition does
not become less free merely because the conduct of com-
mercial operations becomes more intelligent through the
free distribution of knowledge of all the essential factors
entering into the commercial transaction.[1]    General
knowledge that there is an accumulation of surplus of any
market commodity would undoubtedly tend to diminish
production, but the dissemination of that information
cannot in itself be said to be restraint upon commerce in
any legal sense.   The manufacturer is free to produce, but
prudence and business foresight based on that knowledge
influence free choice in favor of more limited production.
Restraint upon free competition begins when improper
use is made of that information through any concerted
action which operates to restrain the freedom of action of
those who buy and sell.

It was not the purpose or the intent of the Sherman
Anti-Trust Law to inhibit the intelligent conduct of busi-
ness operations, nor do we conceive that its purpose was to
suppress such influences as might affect the operations of
interstate commerce through the application to them of
the individual intelligence of those engaged in commerce,
enlightened by accurate information as to the essential
elements of the economics of a trade or business, however

---

[1] See a suggestive analysis of the Competitive System by various
Economists collected and commented on in Marshall's Readings on
Industrial Society, 294, 419, 479, 498, 935.  See Hobson The Evolution
of Modern Capitalism, 403, 5; Elementary Principles of Economics,
Irving Fisher, 427, et seq.

gathered or disseminated. Persons who unite in gathering and disseminating information in trade journals and statistical reports on industry; who gather and publish statistics as to the amount of production of commodities in interstate commerce, and who report market prices, are not engaged in unlawful conspiracies in restraint of trade merely because the ultimate result of their efforts may be to stabilize prices or limit production through a better understanding of economic laws and a more general ability to conform to them, for the simple reason that the Sherman Law neither repeals economic laws nor prohibits the gathering and dissemination of information. Sellers of any commodity who guide the daily conduct of their business on the basis of market reports would hardly be deemed to be conspirators engaged in restraint of interstate commerce. They would not be any the more so merely because they became stockholders in a corporation or joint owners of a trade journal, engaged in the business of compiling and publishing such reports.

We do not conceive that the members of trade associations become such conspirators merely because they gather and disseminate information, such as is here complained of, bearing on the business in which they are engaged and make use of it in the management and control of their individual businesses; nor do we think that the proper application of the principles of decision of *Eastern States Retail Lumber Association* v. *United States* or *American Column & Lumber Co.* v. *United States* or *United States* v. *American Linseed Oil Company* leads to any such result. The court held that the defendants in those cases were engaged in conspiracies against interstate trade and commerce because it was found that the character of the information which had been gathered and the use which was made of it led irresistibly to the conclusion that they had resulted, or would necessarily result, in a concerted effort of the defendants to curtail production or raise

prices of commodities shipped in interstate commerce. The unlawfulness of the combination arose not from the fact that the defendants had effected a combination to gather and disseminate information, but from the fact that the court inferred from the peculiar circumstances of each case that concerted action had resulted, or would necessarily result, in tending arbitrarily to lessen production or increase prices.

Viewed in this light, can it be said in the present case, that the character of the information gathered by the defendants, or the use which is being made of it, leads to any necessary inference that the defendants either have made or will make any different or other use of it than would normally be made if like statistics were published in a trade journal or were published by the Department of Commerce, to which all the gathered statistics are made available? The cost of production, prompt information as to the cost of transportation, are legitimate subjects of enquiry and knowledge in any industry. So likewise is the production of the commodity in that industry, the aggregate surplus stock, and the prices at which the commodity has actually been sold in the usual course of business.

We realize that such information, gathered and disseminated among the members of a trade or business, may be the basis of agreement or concerted action to lessen production arbitrarily or to raise prices beyond the levels of production and price which would prevail if no such agreement or concerted action ensued and those engaged in commerce were left free to base individual initiative on full information of the essential elements of their business. Such concerted action constitutes a restraint of commerce and is illegal and may be enjoined, as may any other combination or activity necessarily resulting in such concerted action as was the subject of consideration in *American Column & Lumber Co.* v. *United States, supra* and *United*

*States* v. *American Linseed Oil Co., supra.* But in the absence of proof of such agreement or concerted action having been actually reached or actually attempted, under the present plan of operation of defendants we can find no basis in the gathering and dissemination of such information by them or in their activities under their present organization for the inference that such concerted action will necessarily result within the rule laid down in those cases.

We decide only that trade associations or combinations of persons or corporations which openly and fairly gather and disseminate information as to the cost of their product, the volume of production, the actual price which the product has brought in past transactions, stocks of merchandise on hand, approximate cost of transportation from the principal point of shipment to the points of consumption, as did these defendants, and who, as they did, meet and discuss such information and statistics without however reaching or attempting to reach any agreement or any concerted action with respect to prices or production or restraining competition, do not thereby engage in unlawful restraint of commerce.

*The decree of the District Court is reversed.*

----

Mr. Chief Justice Taft and Mr. Justice Sanford dissent from the opinions of the majority of the Court in these two cases [1] on the ground that in their judgment the evidence in each case brings it substantially within the rules stated in the *American Column Co.* and *American Linseed Oil Co. Cases,* the authority of which, as they understand, is not questioned in the opinions of the majority of the Court.

----

[1] The present case and the one next following.

The separate opinion of MR. JUSTICE McREYNOLDS.

These causes[1] disclose carefully developed plans to cut down normal competition in interstate trade and commerce.   Long impelled by this purpose, appellants have adopted various expedients through which they evidently hoped to defeat the policy of the law without subjecting themselves to punishment.

They are parties to definite and unusual combinations and agreements, whereby each is obligated to reveal to confederates the intimate details of his business and is restricted in his freedom of action.   It seems to me that ordinary knowledge of human nature and of the impelling force of greed ought to permit no serious doubt concerning the ultimate outcome of the arrangements.   We may confidently expect the destruction of that kind of competition long relied upon by the public for establishment of fair prices, and to preserve which the Anti-trust Act was passed.

*United States* v. *American Linseed Oil Co.,* 262 U. S. 371, states the doctrine which I think should be rigorously applied.   Pious protestations and smug preambles but intensify distrust when men are found busy with schemes to enrich themselves through circumventions.   And the Government ought not to be required supinely to await the final destruction of competitive conditions before demanding relief through the courts.   The statute supplies means for prevention.   Artful gestures should not hinder their application.

I think the courts below reached right conclusions and their decrees should be affirmed.

---

[1] The present case and the one next following.