## WOLF & CO. v. ORLEANS LUMBER CO., Inc. *

### No. 14333.

Court of Appeal of Louisiana. Orleans.

June 29, 1933.

---

*Rehearing denied October 16, 1933.

Prowell, McBride & Ray, of New Orleans, Welton P. Mouton, of Lafayette, and Leon Sarpy, of New Orleans, for appellant.

Normann & McMahon and Harold M. Rouchell, all of New Orleans, for appellee.

WESTERFIELD, Judge.

The issue presented by this appeal is the validity of a certain contract between lumber dealers in the city of New Orleans and adjacent parishes whereby the Lumber Exchange, Inc., was created, when contrasted with Act No. 11 of the Extra Session of the Legislature of 1915, which declares that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State of Louisiana is hereby declared to be illegal." If the contract referred to is valid, the plaintiff, Wolf & Co., as the assignee of the Lumber Exchange, Inc., is entitled to a judgment against the defendant, Orleans Lumber Company, in the sum of $967.44, and, if invalid, the judgment appealed from dismissing plaintiff's suit should be affirmed.

The contract in question is an agreement between a majority of the retail lumber dealers doing business in the parishes of Orleans, Jefferson, and St. Bernard, whereby the Lumber Exchange, Inc., was created for the alleged purpose of making "it possible for the general public and for all persons interested in the purchase or sale of lumber in the New Orleans territory to have a convenient and reliable source of information regarding the prices asked by the Member and the Dealers for Lumber, sold in said New Orleans territory." It was provided that a board room should be established in the exchange, where, on blackboards provided for that purpose, there would be posted "the name of the Member and the names of the Dealers, and, in appropriate designated spaces, the respective prices asked by the member and by the several dealers for each item or description of lumber, on sale by the member or by the dealers or any of them in the New Orleans territory, according to the latest information supplied to the Exchange by the Member and the Dealers in accordance with the provisions of this contract, and of the substantially identical contracts between the Exchange and the Dealers." Each of the parties to the contract was required to give full reports of all sales, as will be seen by the following provision: "The Member shall mail to the Manager copies of all invoices covering the sales of lumber in said territory, indicating thereon the time at which such orders were taken by the Member, and said invoices shall cover all the deliveries made in the previous thirty days * * *."

The members were also required to inform the exchange of the prices which it was contemplated would be asked for lumber on hand for sale, and this information was to be posted on the blackboard. The prices could be changed at will, but "during the term of this agreement the member shall never sell lumber in the New Orleans territory except at the prices and according to the terms as to payment and delivery which it has caused to be posted on the board." A penalty for the violation of the contract was provided by the assessment of $15 upon each thousand feet of lumber sold in disregard of the agreement. The penalties collected in this manner were to be distributed pro rata to all the members of the exchange.

The argument is that the contract thus described was, per se, illegal, in that it contravened the laws of the state of Louisiana with respect to monopolies and unlawful combinations in restraint of trade. Article 13, section 5, of the Constitution of 1921, reads as follows: "The Legislature shall enact general laws for the creation and regulation of corporations and for the prohibition of monopolies; and shall provide also for the protection of the public, and of the individual stockholders."

Act No. 11 of the Extra Session of 1915, which was passed pursuant to an identical clause in the Constitution of 1898, in its title declares the purpose of its enactment to be "to protect trade and commerce against unlaw restraints, combinations, conspiracies and monopolies, and to provide remedies against same. * * *" Section 1 of this act provides: "Be it enacted by the General Assembly of the State of Louisiana, That every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the State of Louisiana is hereby declared to be illegal. * * *"

The language of this section is the same as that of section 1 of the Sherman Anti-Trust Act (15 USCA § 1, 26 Stat. 209, July 2, 1890, c. 647, § 1), with the exception, of course, that the Sherman Act is made to apply to interstate commerce. The decisions of the federal court concerning the Sherman Anti-Trust Law are therefore in point, and are almost exclusively relied upon by both coun-

sel, who have cited numerous cases and quoted many excerpts from this jurisprudence. For our own part, we feel unequal to a review of the numerous cases making up the federal jurisprudence on the question of unlawful restraint of trade reprobated by the Sherman Act. In the first place, we have neither the inclination nor the time, and the writer of this opinion lacks the vitality, to consider, in anything approaching a comprehensive view, the numerous adjudications, the refinements in logical distinction, and the nicety of reasoning whereby differences are made to depend upon the "estimation of a hair." The subject is most interesting and entertaining, marked, as it is, by the brilliancy and learning of the judges who presently are, and in the past have been, members of the Supreme Court of the United States, the most exalted tribunal on earth, among whom may be prominently mentioned the late Edward Douglas White, formerly Chief Justice and a lifetime resident of Louisiana, whose notable contribution to the judicial discussion known as the "rule of reason" has dominated the later jurisprudence, though originally expressed in a dissent. At first the court was inclined to apply the judicial baton to every monopolistic head which raised its ugly features above the rest (United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 S. Ct. 540, 554, 41 L. Ed. 1007 [1897]), but subsequently this view was modified, and we witnessed a division of monopolies into good and bad trusts and the introduction of the "rule of reason" into the discussion (American Tobacco Co. v. United States, 211 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663 [1911], Standard Oil Co. v. United States, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. [N. S.] 834, Ann. Cas. 1912D, 734 [1911]) and finally, in the latest pronouncements on the subject, Appalachian Coals, Inc., v. United States, 288 U. S. —, 53 S. Ct. 471, 474, 77 L. Ed. — (1933): "Realities must dominate the judgment. The mere fact that the parties to an agreement eliminate competition between themselves is not enough to condemn it."

It is difficult to read or to study this jurisprudence without paraphrasing the lines of the poet:

"Monopoly is a monster of so hideous a mien,
    As to be hated needs but be seen.
    But seen too oft, familiar with its face,
    We first endure, then pity, then embrace."

We are admonished, however, against generalization and fixed formulas (Maple Flooring Mfrs. Ass'n v. United States, 268 U. S. 563, 579, 45 S. Ct. 578, 592, 69 L. Ed. 1093), and advised that each case must stand or fall upon its own facts; the Sherman Law being intended to be adaptable to changing economic conditions. It is "a charter of freedom" and "has a generality and adapta-

bility comparable to that found to be desirable in constitutional provisions. * * * Its general phrases, interpreted to attain its fundamental objects, set up the essential standard of reasonableness. They call for vigilance in the detection and frustration of all efforts unduly to restrain the free course of interstate commerce," and the decisions establish "that only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade." Chief Justice Hughes in Appalachian Coals, Inc., v. United States, supra.

It will be remembered that the act Judge Hughes was referring to reads as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" among the several states or with foreign nations, is hereby declared to be illegal, and, as a matter of historical interest, the language of Judge Hughes should be contrasted with that of Judge Peckham in United States v. Trans-Missouri Freight Ass'n, supra, from which we quote the following: "It is now with much amplification of argument urged that the statute, in declaring illegal every combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, does not mean what the language used therein plainly imports, but that it only means to declare illegal any such contract which is in unreasonable restraint of trade, while leaving all others unaffected by the provisions of the act; that the common-law meaning of the term 'contract in restraint of trade' includes only such contracts as are in unreasonable restraint of trade; and when that term is used in the federal statute it is not intended to include all contracts in restraint of trade, but only those which are in unreasonable restraint thereof."

Judge Peckham then proceeds to a discussion of the common-law term "contracts in restraint of trade," and concludes that the act means what it says and embraces every contract in restraint of trade, whether reasonable or unreasonable, which comes within the ban of the act, concluding with the following expression: "To say, therefore, that the act excludes agreements which are not in unreasonable restraint of trade, and which tend simply to keep up reasonable rates for transportation, is substantially to leave the question of reasonableness to the companies themselves."

In an article by Robert L. Raymond in the Harvard Law Review, vol. 23, p. 353 (1909–1910), we find the following comment upon the Sherman Act: "The first fact to be noted is that the words quoted above have meant very different things to different individuals.

They signified one thing to the framers of the law; another to the judges who composed the Supreme Court in 1897; still another to the judges who formed the Court in 1904. Moreover, in eight out of the ten leading cases in which this statute has been before the Supreme Court its words have meant one thing to some members of the court and another to other members. This difference of opinion shows clearly that the Anti-Trust Act standing by itself has no precise and easily ascertained meaning. Nearly all of the cases on the statute might have been decided the other way without furnishing clear ground for criticism. Manifestly the interpretation of the Act has been peculiarly a case of judicial legislation. The existing law as to restraints of interstate trade and commerce and the monopoly of the same is judge-made law, and is to be found only in the decisions of the Supreme Court."

Mr. Raymond wrote before the decisions in American Tobacco Company v. United States and Standard Oil Company v. United States had been handed down, in which the "rule of reason" was for the first time adopted.

Two decades intervened between Judge Peckham's decision and that of Judge Hughes. Epochal changes in economic conditions had occurred, the world had been convulsed in war and depressed beyond conception by post-bellum industrial and commercial collapse. The doctrine of laissez faire had to be amended or abandoned.

"The laissez faire doctrine was originally opposed not only to state intervention but also to combination designed to influence prices on the ground that this too must tend to decrease the total utility produced. But the efforts of its advocates to prevent combination through anti-trust legislation and by regulation of monopolies have either failed or resulted in a negation of laissez faire by calling for extensive intervention on the part of the state. Combination among producers cannot be prevented but at most only regulated. Preventive measures fail, and regulative measures result in an abandonment of laissez faire. Combination has therefore to be accepted by modern advocates of laissez faire as part of the system of private enterprise; and laissez faire comes to mean not the absence of combination but the fullest freedom of action for it." G. D. H. Cole, in Encyclopedia of Social Sciences, vol. 9, p. 18 (McMillan Company).

These changed and changing economic conditions had doubtless impressed themselves upon the court and were not without proper influence. We hasten to add that what we have had to say on the subject of the inconsistency in the federal jurisprudence is not intended in any spirit of criticism. Judge Cardozo, in his interesting little book entitled "The Nature of the Judicial Process," devotes a chapter to the subject of "The Judge as a Legislator." In that chapter he calls attention to the fact that under article 4 of the French Civil Code the judge who refuses to give judgment "under pretext of the silence, of the obscurity, or of the inadequacy of the law, shall be subject to prosecution as guilty of a denial of justice." Quoting further from this source:

" 'It is the function of our courts,' says an acute critic, 'to keep the doctrines up to date with the mores by continual restatement and by giving them a continually new content. This is judicial legislation, and the judge legislates at his peril. Nevertheless, it is the necessity and duty of such legislation that gives to judicial office its highest honor; and no brave and honest judge shirks the duty or fears the peril.' * * *

"Their conclusions must, indeed, be subject to constant testing and retesting, revision and readjustment; but if they act with conscience and intelligence, they ought to attain in their conclusions a fair average of truth and wisdom. The recognition of this power and duty to shape the law in conformity with the customary morality, is something far removed from the destruction of all rules and the substitution in every instance of the individual sense of justice, the arbitrium boni viri."

There are comparatively few cases in Louisiana on the subject. However, in Tooke & Reynolds v. Bastrop Ice & Storage Co., 172 La. 781, 135 So. 239, 243, we find the following statement of opinion on the subject of price fixing: "The test of the illegality of a combination or an attempt to create a monopoly is not what the combination or attempted monopoly has accomplished, but what may be accomplished; not what has been done, but what may be done once the participants get in power to accomplish their purpose. If the natural tendency or probable effect of the combination or monopoly is the restraint of trade by stifling competition or to discourage enterprise and industry, the combination or monopoly is deemed to be detrimental to the public welfare and falls within the teeth of the law."

We will now consider the alleged price-fixing scheme in the case at bar for the purpose of comparing it with the particular transactions involved in cases which have been considered by the federal courts for purposes of analysis in the light of that jurisprudence and in obedience to the oft-repeated warning against any attempt at generalization. It will be recalled that a majority of the local lumber dealers in New Orleans and adjacent territory agreed to post prices on a blackboard in a convenient locality under the supervision of the Lumber Exchange, Inc., a corporation created for that purpose. The parties to the agreement guaranteed each

other that no sales would be made at any other prices than those listed on the exchange with copies of all invoices, together with the terms of payment, discounts, and place of delivery of the merchandise. He could change the price upon the board by certain procedure, but, until the change was effected, he was obliged to sell at the price posted, or subject himself to heavy penalties. We find two federal cases where a plan or agreement very similar to the one under consideration here was condemned as an unlawful restraint of trade under the Sherman Act. We refer to American Column & Lumber Co. v. United States, 257 U. S. 377, 42 S. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093; and United States v. American Linseed Oil Co., 262 U. S. 371, 43 S. Ct. 607, 67 L. Ed. 1035. In the first cited case a scheme called "Open Competition Plan" was considered, which the court describes as "a system of cooperation among the members, consisting of the interchange of reports of sales, prices, production, and practices, and in meetings of the members for discussion, for the avowed purpose of substituting 'co-operative competition' for 'cutthroat competition,' of keeping 'prices at reasonably stable and normal levels,' and of improving the 'human relations', among the members. But the purpose to agree upon prices or production was always disclaimed."

Without going into details concerning the plan under consideration in that case, we find that there, as here, members reported to the secretary, giving description of the sales made, copies of invoices, and they were required to post prices with the association. In condemning the practice, the court said that, while no specific agreement was made to restrict sales or fix prices, it was nevertheless true "that the fundamental purpose of the Plan was to procure 'harmonious' individual action among a large number of naturally competing dealers with respect to the volume of production and prices. * * *"

In the last-cited case the resemblance to the plan in the instant case is very striking. There "a combination of large competing manufacturers and distributors of linseed oil, cake and meal, by means of subscriptions to a so-called exchange, conducted by a so-called bureau, whereby each subscriber was required to reveal intimate details of its affairs, and furnish a schedule of prices and terms, and adhere thereto, unless more onerous ones were obtained, until prepared to give immediate notice of departure therefrom for relay by the bureau, and agreed to attend monthly meetings, and report matters of interest, and comply with all reasonable requirements of the bureau, and divulge no secrets," was held "to have necessary tendency to suppress competition, and unlawful under the Sherman Act." The court held, in

a lengthy opinion, that this plan came within the ban of the statute.

The number dealers in the case before us, by requiring that the posted prices be maintained under heavy penalties, and by stipulating that all invoices and other data concerning sales should be posted with the exchange, must have had as their primary object the stabilization or fixing of price for the sale of their product. The effect of such an arrangement upon competition and its restraint upon trade, it seems to us, is obvious.

For the reasons assigned, the judgment appealed from is affirmed.

Affirmed.