**SALT PRODUCERS ASS'N et al. v. FEDERAL TRADE COMMISSION.**

No. 7909.

Circuit Court of Appeals, Seventh Circuit.

March 8, 1943.

James B. Wescott and L. M. McBride, both of Chicago, Ill., Frederic R. Sanborn, of New York City, W. H. Mandeville, of Elmira, N. Y., Frank J. Madden, of Chicago, Ill., J. Porter Henry, of St. Louis, Mo., Lester E. Waterbury, of New York City, Thomas A. Ballantine, of Louisville, Ky., Wm. D. P. Carey, of Hutchinson, Kan., Louis H. Hall, of New York City, and Henry E. McElwain, Jr., of Louisville, Ky., for petitioners.

Jos. J. Smith, Jr., Walter B. Wooden, W. T. Kelley, Chief Counsel, Floyd O. Collins, and James W. Nichol, Attys. for Federal Trade Commission, all of Washington, D. C., for respondent.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

This petition, to review a Federal Trade Commission cease and desist order, challenges simply the phraseology of the order and not the issuance of the order.

.The petitioners are eighteen salt companies and the Salt Producers Association.

A complaint filed against petitioners and others (some since dissolved), in September, 1940, charged a combination, formed in October, 1935, to monopolize, and to sup-

press competition in, the sale of salt, to fix uniform prices, to establish zones to aid in fixing of prices, to curtail production of salt, to exchange price lists through the Association in order to establish the prices at which salt is sold, and to exchange information relative to conditions of sales.

The petitioners, after filing individual answers wherein each denied the allegations of the complaint, withdrew them and filed similar and very brief, individual substitute answers.[1] Therein "they admit (ted) all of the material allegations of fact set forth in said complaint and waive (d) all intervening procedure and further hearing as to the said facts."

Thereupon the Federal Trade Commission made detailed findings of fact and a conclusion, and entered the cease and desist order, the form and substance of which are here assailed. The provisions of said order are here stated, in excerpt form, and the italicized portions are the parts contested:

" * * * (petitioners) * * * in connection with the offering for sale, sale, and distribution of salt in commerce, * * do forthwith cease and desist from entering into, continuing, or carrying out, or directing, instigating, or cooperating in, *any common course of action,* mutual agreement, combination, or conspiracy, to fix or maintain the prices of salt or curtail, restrict, or regulate the production or sale thereof, and from doing any of the following acts or things pursuant thereto:

" * * * * * *

"(3) *Establishing or maintaining delivered price zones, or making quotations and sales of salt upon a delivered price basis under a zone system whereby the cost of salt delivered to buyers within each respective zone is made identical at all destinations within such zone;*

"(4) *Exchanging, directly or through the Salt Producers Association, or any other agency or clearing house, price lists, invoices, and other records of sale showing the quantity, current prices and terms and conditions of sale allowed by respondent corporations to dealers and distributors;* provided, however, that nothing herein shall prevent the respondent association from collecting and disseminating to the respective respondent manufacturers figures showing the total volume of sales of salt without disclosing the sales volume of individual producers;

"(5) Exchanging, directly or through the medium of the Salt Producers Association, or any other agency, the names of distributors or dealers who receive special discounts;

"(6) *Curtailing, restricting, or regulating the quantity of salt to be produced and sold by any respondent corporation by any method or means during any given period of time; * * *.*"

I. *"Common Course of Action."* The first complaint is as to the phrase "common course of action," appearing in the preamble, directing that petitioners desist from "any common course of action, mutual agreement, combination, or conspiracy, to fix or maintain the prices of salt or curtail, restrict, or regulate the production or sale thereof, * * *" Petitioners assert a common course of action is thus prohibited whether or not it be connected with a *conspiracy.* And the facts of the *complaint,* of the Federal Trade Commission, admitted by the petitioners, only covered conspiracies *per se,* and so would not support an order such as this, which could prohibit action to foster fair competition, and which might cover *accidental* and *coincidental* identical action by all.

They urge that "Where a common course of action occurs as the natural result of competition and is not connected with or related to a 'mutual agreement, combination or conspiracy,' the continuance of such common course of action is not prohibited by law."

Since the complaint does not cover the prohibition against a common course of action, and F. T. C. orders may comprehend only matters covered by the complaint,[2] such a prohibition would be invalid, so they argue.

They also assert that the prohibition against a "common course of action" is novel in this case. True, it was used once before, but only in conjunction with the phrase *"pursuant* to conspiracy."

The F. T. C. insists on the inclusion of this phrase "common course of action." Petitioners are uncompromisingly opposed to it. The parties seem to be pretty much agreed as to the acts which are sought to

[1] Stevenson Company filed a new, very detailed answer.

[2] F. T. C. v. Gratz, 253 U.S. 421, 40 S. Ct. 572, 64 L.Ed. 993; Wrisley Co. v. F. T. C., 7 Cir., 113 F.2d 437.

be condemned by the order, but they fail, or refuse, to agree upon the precise language which embodies the thought upon which they are agreed.

More accurately, respondent says its language conveys the precise thought involved. In essence, petitioners contend "common course of action" connotes, and includes, common action by the parties, occurring through pure happenstance. Respondent says it does not mean similar action, undertaken independently without previous agreement therefor. The words used in apposition to the phrase "common course of action" ("agreement, combination or conspiracy") all contain the element of mutually planned action, which fact would tend to support respondent's construction of the language it uses.

█ But, since petitioners contend they may legally only be barred from "*planned*" mutual action,[3] and the F. T. C. says that is all its order is intended to accomplish,[4] it would seem advisable and fair to modify and amend that phrase of the order by adding the word "planned" before the phrase "common course of action" so that only illegal *contractual* arrangements will be subject to contempt proceedings. The word "planned" as here used is intended to cover any "cooperative" or "concerted" action by petitioners to fix prices and curtail production.

II. *"Establishing delivered price zones."* Par. "(3)" of the order prohibits the establishment of uniform prices for specified zone areas. Petitioners asked that this paragraph be eliminated from the order, or at least modified to permit quotation of prices on "delivered price basis."

It is argued the zone system of prices has many advantages to industry—it equalizes prices to various customers and thus prevents discrimination; it facilitates quotation of "delivered" prices.

Respondent construes its paragraph "(3)" in this way:

"It does not unqualifiedly prohibit quotations on a delivered price basis and for delivered price zones. * * * In other words it is only when the result is to make identical the delivered prices of the respective producers that such quotations are forbidden. There is nothing in the order to prohibit any producer from quoting a delivered price, provided he does not make it identical with his competitors' prices under a zone system which was admittedly set up for that purpose."

It points out that the complaint and findings reveal an *agreed* system of zones and *cooperation* in maintenance of prices within the zones. It says:

"It was specifically alleged and admitted that these delivered price zones were established by agreement and in order 'to aid in the establishment and fixing of prices of salt.' It was specifically alleged and admitted that the producers had 'agreed to co-operate, and have cooperated, in the maintainance of the various prices deter-

---

[3] "It is not contended that cooperation by petitioners pursuant to a preconceived *plan, understanding, agreement* or any *expressed mutual undertaking*, by whatever name it may be described, may not be prohibited. To the extent, however, that cooperation is under a preconceived plan, agreement or understanding it constitutes a "mutual agreement, combination or conspiracy," and is prohibited by the order without the use of the term "common course of action." *But to the extent that continuing or entering into a common course of action applies to acts unrelated to an express mutual undertaking, resulting from independent activity and produced by natural competing forces, that provision of the order is beyond the power and jurisdiction of the Commission.*

"* * * *To the extent that any common course of action is the continuation of a conspiracy, or is pursuant to an agreement or understanding between any of petitioners, it is prohibited by the or-* der without employing the phrase 'any common course of action.'"

[4] "* * * The order does not prohibit a common course of action or 'an independent activity' unrelated to petitioners' admitted combination. * * *

"Needless to say the Commission has no thought that it can or should interfere with the independent or competitive determination of prices or production policy by the petitioners and the order is not fairly susceptible of such interpretation. The legal and economic concept of price fixing automatically excludes independent action. Petitioners assume without warrant for purposes of their argument that the legal and economic concept may include it. The idea that petitioners might be proceeded against for violation of the order because of such independent competitive determination is grotesque and would hardly occur to any one who in good faith acts independently and competitively."

mined for particular zones.' If, under these circumstances, the Commission has not the power to prevent the continued use of such zones and the quotation of delivered prices uniform within such zones, then it can not outlaw the very device which created the 'uniform prices' of the admitted combination and which device was admittedly created by agreement for that purpose."

Respondent would not only prohibit agreements of petitioners as to identical zones and prices, but challenges the legality of the establishment of any zone-price schedule, individually by the petitioners as wrongfully abolishing "natural factors" (distance of purchaser from point of production) in determination of prices.

Petitioners concede they may be barred from establishing *agreed* zones delivered price rates, but ask for the right to have zone prices.

The complaint, paragraph 24, charges combinations and agreements to fix uniform prices in the United States and in aid thereof have agreed to, and have, established zones and have cooperated in the maintenance of various prices determined for the particular zones. The Commission's findings found as a fact that the agreed zone system was for the purpose of establishing fixed delivered prices in zones.

■■ We are convinced that petitioners should not be denied all right to the use of the "zone" delivered price basis. The Commission is, however, within its authority when it condemns and prohibits the establishment, through a combination or contract, express or implied, of a similar, nationwide zone system for the respective petitioners. The complaint discloses the Commission's aim to eradicate and prohibit all *concert* of action by these petitioners, looking to the establishment and fixation of prices. There was no indication in the complaint that they were assailing the zone system *per se* as an unfair method of competition by *one* manufacturer in relation to

two purchasers of his salt, in the same zone, where the freight costs are averaged, and one bears a greater burden than the actual freight cost incurred.

If the zone system *per se* is to be condemned, there ought to be a hearing by the Commission and a finding on the precise issue of the unfairness of such a commercial practice.

■ We must take judicial cognizance of the fact that the Government postal service has established statutory zones and uniform prices fixed within said zones. (39 U.S.C.A. §§ 292, 293). Likewise, railroad tariffs are also based on zones.

■ We therefore restrict paragraph "(3)" to a prohibition of uniform delivered price zones established *heretofore,* admittedly through the conspiracy.[5]

■ III. *"Exchanging price lists * * * and other records of sale. * * *"* The order forbids "pursuant" to the conspiracy, etc., the exchanging of "price lists, invoices, and other records of sale showing the quantity, current prices and terms and conditions of sale allowed by respondent corporations to dealers and distributors. * * *"

Both parties point to and rely on Supreme Court decisions[6] to support their positions.

The Commission contends that the exchange of price lists was, here, no innocent enlightenment of trade practices, but was an indispensable aid to an admitted conspiracy to fix prices.

In the Sugar Institute case, the court made clear its position on the dissemination of trade information.

See also Maple Flooring Association v. United States, 268 U.S. 563, 45 S.Ct. 578, 585, 69 L.Ed. 1093. We quote therefrom:

"It is the consensus of opinion of economists and of many of the most important agencies of government that the public interest is served by the gathering and dissemination, in the widest possible manner,

---

[5] The complaint, listing the petitioners, show them to have their "principal places of business" in widely varying places. If the zones were of areas circumscribing (concentric) with these focal places there could not be identical zones for the respective petitioners. It may be, however, that *all* the salt is processed in, say, Utah, in which case establishment of identical zones could logically occur.

[6] Commission relies on American Col-

umn Co. v. United States, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284, 21 A.L.R. 1093; United States v. American Linseed Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035.

Petitioners rely on Maple Flooring Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; Sugar Institute, Inc., v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859.

of information with respect to the production and distribution, cost and prices in actual sales, of market commodities because the making available of such information tends to stabilize trade and industry, to produce fairer price levels and to avoid the waste which inevitably attends the unintelligent conduct of economic enterprise. * * * Competition does not become less free merely because the conduct of commercial operations becomes more intelligent through the free distribution of knowledge of all the essential factors entering into the commercial transaction. * * *"

Equally clarifying are the two opinions cited by respondent: The American Column case and the American Oil case, supra. Both hold that the agreements for dissemination of price statistics and numerous other business practices there under consideration, constituted such a combination in restraint of trade as to fall within the condemnation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note.

In the instant case, we have an illegal restraint, by admission of the guilty parties. But, conceding such to be the fact, once the conspiracy and agreement are outlawed, and recurrence thereof subject to contempt action, future action on petitioners' part, disassociated with conspiracy or unfair competition, is permissible. It is only when such dissemination of information is integral with a scheme to restrict competition, and used as an instrumentality therefor, that the court will forbid such public announcement of statistics to the companies engaged in selling a similar product.

Some phases of this exchange of statistical information are legal, and not within the condemnation of the Anti-Trust Act. We therefore conclude that the order of the F. T. C. goes beyond its permissible scope in paragraph "(4)" if it be construed to prohibit altogether the exchange of "price lists, invoices, and other records of sale showing the quantity, current prices and terms and conditions of sale allowed by respondent corporations to dealers and distributors." But, if such action continues as a part of the, or a, conspiracy, it constitutes an illegal restraint of trade.

The same conclusion is true as to paragraph "(5)."

IV. The last objection to the form of the Commission's order concerns the prohibition contained in paragraph "(6)" which forbids "Curtailing, restricting, or regulat-

ing the quantity of salt to be produced and sold by any respondent corporation by any method or means during any given period of time * * *."

Petitioners contend that under the Supreme Court decision of F. T. C. v. Bunte Bros., 312 U.S. 349, 61 S.Ct. 580, 85 L.Ed. 881, the Commission has no power or authority to control the purely intrastate activity of production of salt, and even if the Commission had power, it would be exceeding such power to forbid the petitioners to regulate and restrict the amount of production.

Respondent answers that although the production of salt is a local matter, its order in no way affects the *production* of salt—it is directed to a practice of petitioners, which *practice* affects the production of salt; that the petitioners are producers located in many states, and the *commerce between said states* is directly and actually affected by the conspiracy to restrict production. The Commission also points out that it unquestionably has the authority to prohibit a price-fixing conspiracy, and the prime element of any price-fixing conspiracy is the ability to regulate production, therefore it has the right to reach and regulate any manifestation of and instrumentality used in aid of such a price-fixing conspiracy. It also points out that the order is directed to prohibit a curtailment of *sales* as well as production.

Here again, respondent stresses the fact that this paragraph "(6)," as with all the preceding paragraphs, "is subordinate to and limited by the general preamble with reference to agreement, combination, conspiracy and common course of action," and "the preamble shows that paragraph (6) applies only when the object of the combination or common course of action is 'to fix or maintain the prices of salt or curtail, restrict, or regulate the production or sale thereof.'" "Paragraph (5) has no application to independent, non-collusive restriction of production by the legal owner of any salt plant, but only to such restriction as is 'pursuant' to an agreement, combination, conspiracy or common course of action."

■ Respondent was acting within its legal power when it directed a cessation of any conspiracy to curtail or regulate the production of salt. The production of salt is a local transaction, but an *agreement* between many producers, of diverse citizen-

ship, to limit their respective productions is an unfair method of competition *in* interstate commerce. The Bunte case, supra, is not, we think, a holding to the contrary. It was there held that the Commission had no authority to regulate the intrastate sale of candy in break and take packages, although such sales affected interstate commerce. We are not here concerned with either intrastate production or sales *per se;* we are confronted with a conspiracy to directly control interstate commerce and sales.

Our conclusion is that respondent's order would be entirely proper if it were clearly limited to acts done pursuant to the conspiracy of the parties. It is, however, of the utmost importance that the petitioners know exactly what they are prohibited from doing, for their failure to comply, subjects them to punishment for contempt, which punishment should, and doubtless will be, substantial. Petitioners must know definitely what the enforcement order prohibits them from doing. Also it must be clear that such enforcement order does not invade any legal rights which are theirs, when separated from the illegal conspiracy, to which they admittedly were parties.

Respondent is entitled to an order. It will draw a proposed order, modifying its present order to meet the views expressed in this opinion and submit the same to petitioners before submitting the same to this court. Petitioners will have ten days within which to consent or file objections to the order thus submitted by respondent.