381 F.Supp. 845 (1974)
SUNNY HILL FARMS DAIRY COMPANY, a corporation, Plaintiff,
v.
KRAFTCO CORPORATION, a corporation, et al., Defendants.
No. S71 C 71.
United States District Court, E. D. Missouri, Southeastern Division.
April 10, 1974.
*846 *847 Veryl L. Riddle, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for plaintiff.
Luther C. McKinney, Chicago, Ill., Lashly, Caruthers, Rava, Hyndman & Rutherford, St. Louis, Mo., for Kraftco Corp.
Robt. A. Dempster, Dempster, Yokley & Fuchs, Sikeston, Mo., for Malone & Hyde, Inc.
James R. McHaney, Cape Girardeau, Mo., for Farrar Farms Dairy, Inc.
James A. Cochrane, Jr., Finch, Finch, Knehans & Cochrane, Cape Girardeau, Mo., for Ward's Big Star No. 51, Inc.
WANGELIN, District Judge.

MEMORANDUM
This action is before the Court for a decision on the merits following the trial to the Court sitting without a jury.
Plaintiff, Sunny Hill Farms Dairy Co., (hereafter Sunny Hill) brought this private anti-trust action against the defendants. Plaintiff alleges that the defendants, inter alia, conspired to fix prices and reduce plaintiff's dairy case allotment in violation of 15 U.S.C., Section 1.
The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff, Sunny Hill, a Missouri corporation, is a family-owned dairy processing company located in Cape Girardeau, Missouri, and sells its fluid milk and dairy products in the Cape Girardeau, Missouri area and portions of Tennessee and Arkansas. Plaintiff's sales, both retail and wholesale, in the Cape Girardeau area, are made under its Sunny Hill label.
2. Sealtest Foods (hereafter Sealtest) is a division of Kraftco Corporation, a defendant herein. Sealtest operates a milk processing plant and sales office in St. Louis, Missouri, and services the St. Louis area itself. Sealtest relies on distributors in most areas outside metropolitan St. Louis, including the Cape Girardeau area.
3. Defendant Farrar Farms Dairy, Inc. (hereafter Farrar) is the distributor of Sealtest products in the Cape Girardeau area.
4. Defendant Malone & Hyde, Inc., a Tennessee corporation, is a wholesale grocery company operating through eight divisions in the mid-south and midwestern regions of the United States. It has seven major and two auxiliary warehouses located in Missouri, Tennessee, Kentucky, Mississippi and Texas. Each autonomous warehouse maintains an inventory, specializing in national and regional brands, plus a line of private label merchandise packaged under the "Hyde Park" label. Malone & Hyde is the fourth largest voluntary wholesale grocery company in the United States. Independent retail grocers buy from Malone & Hyde by entering into a contract as members of the Malone & Hyde "Voluntary Group Plan". Approximately 80% of an individual store's product line, including produce, frozen foods and dairy products, is supplied by Malone & Hyde. Malone & Hyde also offers its customers membership in "Big Star" advertising groups. Independent retail grocery stores in the Cape Girardeau area which are signatories to the Malone & Hyde "Voluntary Group Plan" are served by the Malone & Hyde warehouse located in Sikeston, Missouri, which also serves approximately 130 other stores located in Missouri, Kentucky, Illinois and Indiana.
5. Defendant Ward's Big Star No. 51, Inc. ("Ward's") is a Missouri corporation which operates a retail grocery store located in Cape Girardeau and which has become a member of and signatory to the Malone & Hyde "Voluntary Group Plan" by executing a Co-operative Store Agreement. Ward's is one of the largest retail grocery stores in Cape Girardeau based on total sales, and at one time it was one of plaintiff's largest customers. Ward's is, in addition, a member of a Malone & Hyde "Big Star" advertising group, which *848 also includes Shopper's Big Star No. 38, Inc., a separate and independent grocery store located approximately one mile from Ward's in Cape Girardeau, and K's Big Star No. 85, Inc., located in Jackson, Missouri.
6. Malone & Hyde entered into two written agreements with its Big Star stores, including Ward's and Shopper's. The first is a "Co-operative Store Agreement," whereby the store becomes a member of the "Voluntary Group Plan". The second agreement is the "Big Star Store" Agreement, whereby the store becomes a member of a Big Star advertising group.[1] These agreements are adhered to and honored by Malone & Hyde and by the Big Star Stores.
7. Farrar distributes not only Sealtest brand dairy products but Wellesley Farm and Malone & Hyde's private label, Hyde Park milk. All three brands of milk are checked out to Farrar at Sealtest's dock in St. Louis on a "load sheet". There is no distinction on the load sheet between the three brand products. Such products are charged out to Farrar and are trucked to Farrar's place of business in Cape Girardeau by an independent hauler at Farrar's expense.
8. With the arrival of the Sealtest, Wellesley Farm and Hyde Park milk at Farrar's warehouse, they are stored in Farrar's cooler until delivery to stores. The amounts charged to Farrar for Sealtest and Hyde Park milks are the same. Farrar delivers the various brands directly to the Malone & Hyde stores and places them in the display area until filled. Thereafter, additional milk is put into a storage area at the back of the store. A Farrar employee stamps the retail price on the incoming milk after consultation with the store employee. It should be noted that there is no difference in the delivery made by Farrar as to Sealtest or Hyde Park milk.
9. When Farrar delivers to one of the Big Star stores, the Farrar employee fills out two slips of paper called "sales tickets", one such ticket for Sealtest brand products and one for Hyde Park products. At the time of delivery, Farrar enters the units delivered, the unit price, and their totals on the Sealtest sales ticket. Whereas, the ticket for the Hyde Park products indicates only the number and type of units without the price.
10. A Farrar office employee enters the unit price of the Hyde Park sales which is dictated by Sealtest, totals the figures, and sends the Hyde Park sales tickets together with copies of the Sealtest tickets to Sealtest in St. Louis. Sealtest then gives Farrar credit against its account for the total amount of such tickets.
11. Thereafter, Sealtest prepares three weekly statements which it sends to Malone & Hyde. The first is a separate statement for each store showing that store's purchases for a week; the second is a single list showing every store's total dollar purchases for that week; and the third is a lump sum bill to Malone & Hyde for all purchases by all the stores. There is no distinction in the statements between Sealtest and Hyde Park milk, nor can Malone & Hyde determine from the bills whether Hyde Park was purchased or the unit price paid for it by a particular store.
12. With the receipt of the aforesaid statements, Malone & Hyde pays Sealtest the lump sum less a two percent discount and forwards the individual store bills prepared by Sealtest to the store without any alteration.
13. Orders for Hyde Park milk by the stores are placed only with Farrar who then places them with Sealtest. Malone & Hyde never has physical possession of Hyde Park milk nor does it know the unit price the stores actually pay for it at the time of delivery.
14. Hyde Park milk and the Sealtest brand milk are of like grade and quality without difference in the cost of processing or packing. Sealtest charges the same price for both brands to Farrar.
*849 15. Before 1968, Sunny Hill and Sealtest were the only milk competitors at the Ward's and Shopper's stores. Prior to the introduction of Hyde Park to Cape Girardeau, Ward's and Shopper's stores gave Sunny Hill approximately 35-50% of their dairy space and Sunny Hill for the most part outsold the Sealtest brand milk.
16. In early 1969, Malone & Hyde approached Sealtest to inquire if it would be interested in supplying a private label milk. Herein, "private label" milk means milk of the same grade and quality as milk packaged under the processor's regular label, but differing as to the carton label.
17. On February 20, 1969, a meeting was held between representatives of Malone & Hyde and Sealtest, whereat Sealtest proposed to process and supply private label milk to Malone & Hyde under the name, Hyde Park. Discussions were held as to the prevention of price wars, dairy case space, and into-store prices. Details were worked out as to distribution and delivery. Sealtest and Malone & Hyde agreed that the Hyde Park milk would cost the stores less than the Sealtest brand and this price difference would be absorbed by distributors like Farrar who would charge the stores less for the Hyde Park milk.
18. Thereafter, another meeting was held on March 27, 1969, in Sikeston, Missouri, whereat into-store price levels were discussed and Sealtest and Malone & Hyde agreed upon the price to sell Hyde Park milk into stores in Cape Girardeau and such prices were to be dictated to Farrar. Out-of-store price levels were also discussed. Malone & Hyde sought a price differential in the out-of-store prices of Hyde Park milk in competitive areas such as Cape Girardeau. Whereas, Sealtest sought the same price for both brands. Sealtest requested that Malone & Hyde exert its influence upon its affiliates to guard against price wars. Sealtest further requested that Malone & Hyde influence its affiliates so that the Sealtest brand and Hyde Park brand milks control the dairy case.
19. On April 15, 1969, Farrar and other Sealtest distributors in Missouri and Illinois were advised by Sealtest that they were to begin delivering Hyde Park milk to Malone & Hyde affiliated stores. This notice gave Farrar its "F. O.B. cost" for Hyde Park and the "selling price" of Hyde Park; it also told Farrar that Sealtest and Hyde Park should control 75% of the milk space in the dairy case at independent stores affiliated with Malone & Hyde.
20. Beginning in May of 1969, Farrar received the Hyde Park milk from Sealtest and was told by Sealtest what the into-store price was pursuant to the aforesaid agreement between Sealtest and Malone & Hyde.
21. Malone & Hyde exercised a considerable amount of influence over its affiliates pursuant to the aforesaid agreements (see finding no. 6) and its bargaining position. Recommendations from Malone & Hyde were followed by its affiliated stores and through these recommendations Malone & Hyde enjoyed limited control over the marketing programs of such stores.
22. As it developed, the Malone & Hyde proposal for a $.02 price retail price difference was acquiesced to by Sealtest and such price difference actually developed in Cape Girardeau. Malone & Hyde instructed its affiliated stores to set the retail price of Hyde Park at a level of two cents below the "national better-known brands". Such instruction was followed. Moreover, Malone & Hyde instructed its affiliates not to start a price war. Such instruction was also followed.
23. Sealtest and Malone & Hyde agreed that their products should control 75% of the milk portion of the dairy case and be placed in the preferred positions in customer flow. To implement this agreement, representatives of Malone & Hyde instructed Ward's and Shopper's to allot 75% of the milk portion *850 of the dairy case and the preferred position to Sealtest and Hyde Park. Thereafter, such instructions were complied with. In both the Ward's and Shopper's stores such allotment for Sealtest and Hyde Park resulted in a substantial reduction for Sunny Hill and their preferential positioning caused Sunny Hill to be relegated to the least desired position in the customer flow.
24. As a direct and proximate result of defendant's agreements to fix into-store and out-of-store prices, and dairy case allotment and preference, plaintiff's sales to Ward's and Shopper's have fallen off substantially since the introduction of the Hyde Park label.
25. In July, 1971, plaintiff lowered its prices $.09 per gallon and $.05 per half gallon in an attempt to compete with the Hyde Park price levels. These lower prices continued until April of 1972 when losses forced plaintiff to raise its prices $.02 per half gallon and $.04 per gallon. Such price reductions continued until the time of trial.
26. The aforesaid price reductions of plaintiff were caused by the aforesaid illegal agreement of Sealtest and Malone & Hyde. Such price reductions were the cause of plaintiff's loss of profits on milk sales. Therefore, the illegally fixed price levels of Hyde Park milk was the proximate cause of plaintiff's loss of profits on milk sales.

Conclusions of Law

Into-Store Price Fixing
In order to recover under the anti-trust laws a plaintiff must prove the following three elements: (1) that the defendants combined and conspired to violate Section 1 of the Sherman Act, 15 U.S.C., Section 1;[2] (2) that there be a causal relationship between the anti-trust violation and the alleged injury; and (3) that there be measurable damage to plaintiff's business or property. Deaktor v. Fox Grocery Co., 475 F.2d 1112 (3rd Cir., 1973); Talon, Inc. v. Union Slide Fastener, Inc., 266 F.2d 731 (9th Cir., 1959).
The sine qua non of horizontal price fixing (i. e., arrangements among competitors) or vertical price fixing (i. e., resale price maintenance agreements) is an agreement to do so.[3] United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1940). Upon establishment of the agreement, there is no need to consider its effect as it is illegal per se. United States v. Socony-Vacuum *851 Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). As the Supreme Court emphasized in the United States v. McKesson and Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209 (1956):
[P]rice fixing is contrary to the policy of competition underlying the Sherman Act . . . its illegality does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices.[4]
As to the explicitness of "subtle means" of price fixing, an unlawful agreement can be as ephemeral as "a knowing wink." Esco Corp. v. United States, 340 F.2d 1000 (9th Cir., 1965) (dicta). Or it can be inferred from a meeting among competitors where prices were discussed and subsequent general uniformity in prices occurred. Esco Corp. v. United States, supra at 1006.
Inasmuch as the defendants Sealtest, Farrar and Malone & Hyde are separate entities, then any agreement between them to fix into or out-of-store prices was a per se violation of the Sherman Act. The record is replete with evidence indicating that Sealtest and Malone & Hyde agreed upon the into-store prices of their competitive products. Although the evidence is less than lucid as to the specific agenda at the Sikeston meeting on March 27, 1969, it is certain that price levels were discussed and into-store prices were agreed upon between Sealtest and Malone & Hyde.[5] From the testimony of Sealtest employees it is clear that Sealtest and Malone & Hyde agreed upon the prices to sell Hyde Park milk into stores in Cape Girardeau[6] and that such prices were dictated to Farrar.[7] This agreement between competing milk suppliers, Sealtest and Malone & Hyde, amounts to illegal horizontal price fixing as proscribed by the Sherman Act.
*852 While as the defendant Sealtest maintains, there can be no doubt that the Sherman Act does not prohibit an agreement on price at which Sealtest would sell the private label milk to Malone & Hyde, the Act does declare illegal an agreement between competitors as to the wholesale price charged to stores. United States v. Masonite Corp., supra. Defendant Sealtest further argues that a wholesaler may resell products to retail grocery stores at prices automatically determined by its costs. This Court does not quarrel with this. In support of this contention the defendant cites Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46 (8th Cir., 1958). Therein, it was held that a labor union contract which might have affected the price at which the dealer could sell and deliver milk, did not in itself cause the contract to be illegal per se. Herein, the distinction is quite apparent, for it cannot be said that an agreement to fix wholesale prices between competitors is anything akin to a union contract which may or may not have had an effect upon wholesale prices. Finally, the defendant Sealtest asserts that it is permissible under the Sherman Act for Malone & Hyde to perform cooperative buying for its affiliated stores and to negotiate in-store price with Sealtest on behalf of the stores. In support of this proposition the defendant cites Associated Greeting Card Distributors of America, 50 F.T.C. 631 (1954). Therein, it was held that the joint purchasing by small business wholesalers is not an unlawful distribution method. Nowhere does the case speak to the issues of competitors setting into-store prices. For this reason that case is inappropriately asserted. The defendant Sealtest further cites G & P Amusement Co. v. Regent Theater, 107 F.Supp. 453 (N.D.Ohio, 1952), aff'd, 216 F.2d 749 (6th Cir., 1954), cert. den., 349 U.S. 904, 75 S.Ct. 579, 99 L.Ed. 1240 (1955); and Arkansas Brokerage Co. v. Dunn & Powell, Inc., 173 F. 899 (8th Cir., 1909) for the same proposition. However, neither one of these cases is relevant nor do they provide authority for competitors agreeing on into-store pricing.

Out-of-Store Price Fixing: Retail Price Maintenance
Section 1 of the Sherman Act, 15 U. S.C., Section 1 refers to a "contract, combination . . . or conspiracy in restraint of trade . . ." To ascertain the meaning of these terms resort must be made to the common law. In re Greene, 52 F. 104 (C.C.S.D.Ohio, 1892). The traditional definition of the term "contract" is an agreement, express or implied, based upon a certain consideration, to perform a particular act. However, these formal requirements do not delimit the concept of contract in its statutory context. Rather, case law teaches that such requisites should not be literally applied so as to determine if the particular conduct is within the framework of Section 1. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1965); Beverage Distributors, Inc. v. Olympia Brewing Co., 440 F.2d 21 (9th Cir., 1971), cert. den. 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971). The statutory term, "combination", is customarily defined as a union or association of two or more persons for the achieving of a common object. Northern Securities Co. v. United States, 193 U.S. 197, 24 S. Ct. 436, 48 L.Ed. 679 (1904). It has more recently been defined as a unilateral act committed by a first party in dealing with a second party wherein the latter concurs in the former's act and related policies with knowledge of their intended effect. See Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed. 2d 998 (1968). The statutory term, "conspiracy", is normally defined as a joint undertaking extending over a period of time with a common purpose, intent or design resulting from a combination or agreement, express or implied, to accomplish an unlawful end or to accomplish a lawful end by an unlawful means. See United States v. Kissel, 218 *853 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168 (1910); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Standard Oil Co. v. Moore, 251 F.2d 188 (9th Cir., 1957), cert. den. 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958).
Aside from the patent differences in the three above statutory terms, there is the tangential requirement of some cognizance of commitment to a common scheme or to some type of joint action. See Dart Drug Corp. v. Parke, Davis & Co., 120 U.S.App.D.C. 79, 344 F.2d 173 (1965). Stated in another fashion, the quintessential yardstick for conduct deemed violative of Section 1 is whether or not there is a collaborative element present. See generally, Pearl Brewing Co. v. Anheuser-Busch, Inc., 339 F.Supp. 945 (S.D.Tex., 1972).
As previously indicated, resale price-fixing is per se illegal.[8] The underlying rationale for this rubric is that "the aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition." United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). This presumed condemnation encompasses price-fixing irregardless of its form. For instance, an agreement to pay or charge rigid, uniform prices is illegal price-fixing under the Sherman Act.[9] As are agreements to raise or lower prices whatever type modes of price-fixing were employed.[10] An agreement to fix the maximum resale price is also proscribed because "such agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951). The eclectic criteria that can be gleaned from these cases for the ascertainment of a violation, is whether the agreement, or conduct, interferes with the freedom of sellers or traders in such a manner as to prohibit or restrain their ability to sell in accordance with their own judgment, and not what particular effect the agreement or conduct has on the actual prices. See Pearl Brewing Co. v. Anheuser-Busch, Inc. supra, 339 F.Supp. at 952.
It is of import to note that the proper jurisprudential vantage point for the scrutinization of price-fixing agreements is one where a broad view is afforded. The drafters of the Sherman Act, unless prescient, could not have anticipated the modern American business complexities nor could they have foretold of the plethora of ingenious methods devised by present day "captains of capitalism" to avoid Section 1 of the Act. For this reason the Act must be liberally construed and applied for the proper enforcement of its dictates. See Pearl Brewing Co. v. Anheuser-Busch, Inc., supra at 952.
Before discussing the existence of resale price maintenance herein, it is necessary to mention the cooperative agreements between Malone & Hyde and its affiliated Big Star stores which when considered in perspective provide a backdrop for a sophisticated form of limited control for Malone & Hyde.[11] One such *854 agreement entered into between Malone & Hyde and its affiliated stores is the "Cooperative Store Agreement" which provides, inter alia, that the member stores will:
2. Cooperate in the entire program of the organization. Feature all products selected for special display and promotion. Purchase from or through the Wholesaler all merchandise handled or recommended by him in all departments, including . . . dairy products, ice cream . . . and other lines.
4. Not feature products competitive with those handled by the Wholesaler and not to advertise or to offer for sale any merchandise except under any brands or of any grades or quality except those approved by the Wholesaler.
6. Accept the help and plans of the Malone & Hyde fieldman and cooperate with him for improved store service and sales.
Another agreement is the "Big Star Store" agreement in which the store becomes a member of the Big Star advertising group. It provides that the retail store will, inter alia:
4. Have available all products advertised in newspapers, on radio, on television or any other means, price-tag, display, and feature same and sell at advertised prices. Use store advertising and display material. Cooperate with Big Star advertising and sales promotion department, especially aggressively participate in the merchandising program, store promotions, food shows, and special events.
5. Not advertise by mailings, circular, radio, newspaper or television, except upon approval of the Wholesaler, and in no event advertise or offer for sale any merchandise below featured advertised prices.
6. Attend membership meetings. All members required to abide by decisions reached by majority vote.
8. Base Big Star store every-day prices throughout the store on `cash and carry' competitive with corporation chains.
The evidence is clear that Sealtest and Malone & Hyde discussed out-of-store price at the March 27, 1969, Sikeston Meeting.[12] At the said meeting, Malone & Hyde sought a price differential (lower than Sealtest) in Hyde Park milk's outof-store *855 prices where competition existed.[13]
Whereas, Sealtest was desirous that Hyde Park milk and Sealtest milk be priced the same.[14] However, it seems that the Malone & Hyde proposition was at least tacitly accepted as Harry Auman, Distributor Sales Manager for Sealtest Foods, agreed with the two cents price differential in depressed markets[15] and such price difference actually developed in the Cape Girardeau market place.[16] Moreover, Sealtest advised Malone & Hyde to guard against and to take measures to prevent price wars from starting.[17]
After the aforesaid discussions and agreements between Sealtest and Malone & Hyde, there was the necessary implementation to effectuate actual retail price maintenance. Again, it must be remembered that Malone & Hyde had considerable control over its affiliates.[18] Therefore, a mere "recommendation" by Malone & Hyde carried much more weight than its nomenclature suggested. Instead, a "recommendation" was more precisely tantamount to a demand.[19] *856 Aside from this definitional quandary, there is direct evidence that Malone & Hyde dictated the out-of-store price to its affiliates.[20]
From an evidentiary standpoint, the existence of the essential combination or conspiracy may be inferred from circumstantial evidence. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1945); Rea v. Ford Motor Co., 355 F.Supp. 842. (W.D.Pa.1973) Herein, not only can the requisite collaborative element be circumstantially shown, but there is substantial direct evidence of a two-level operation whereby Sealtest through Malone & Hyde and in combination with Malone & Hyde limited and prescribed resale prices.
If refutation of a resale price maintenance charge, the defendant urges that there is no anti-trust violation with the mere recommendation of a non-binding resale pricing policy. Maple Flooring Mf'rs' Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925). Cement Mfrs. Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925). Here again the sophistry of semantics enters the scenario, as this Court finds more than a mere non-binding resale price recommendation, but a subtle mode of dictating resale price. Whether the protean means take the form of binding price, or as in this case the formula of two cents below the "national better-known brands,"[21] it still smacks of an anti-trust violation and shall not be countenanced by this Court.

Dairy Case Restraint
Another device employed by the defendants to restrain trade was the reduction of a dairy case space allotted to the plaintiff, Sunny Hill, with a corresponding increase to Hyde Park and Sealtest milks. Prior to the introduction of Hyde Park milk, Sunny Hill milk was in some stores the brand preferred by customers. However, part of the marketing program for Hyde Park milk in conjunction with Sealtest milk was to control the dairy case, both spatially and in the preferred positions in the customer flow.[22] This was partially evidenced by the notices sent by Sealtest to its distributors (e. g. Farrar) which stated that the two milk brands should control at least seventy-five per cent of the milk space. This dairy case control was further *857 implemented by representatives of Malone & Hyde instructing the retailers to allot seventy-five per cent of the dairy case and the preferred position in customer flow to Sealtest and Hyde Park.[23] The final corroboration for the marketing program was the uncontroverted evidence that in fact Hyde Park and Sealtest milk controlled seventy to eighty per cent of the dairy space in the Ward's and Shopper's Stores, whereas, immediately prior to the introduction of Hyde Park milk Sunny Hill milk occupied an appreciably greater amount of dairy space with a more preferred position.

Causation
The second element that must be shown for recovery under the anti-trust laws is a causal relationship between the anti-trust violation and the alleged injury. Properly stated, it is necessary for Sunny Hill to show that defendants' illegal conduct "materially contributed" to plaintiff's injury, notwithstanding the existence of other significant causative factors. Continental Co. v. Union Carbide, 370 U.S. 690, 702, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). See Weiman Co. v. Kroehler Mfg. Co., 428 F.2d 726 (7th Cir., 1970). It has been shown that a conspiracy or combination between the defendants caused the setting of into-store prices of the defendants' milk products, the setting of out-of-store prices of the defendants' milk products and the reduction of plaintiff's display space in favor of the defendants' milk products (including loss of consumer flow preference). This Court finds that such illegal conduct "materially contributed" to plaintiff's injury.[24]

Damages
Any person injured in his business or property by reason of another's violation of the anti-trust laws may recover treble damages from the wrongdoer(s). 15 U.S.C., Section 15. The damage question in private anti-trust suits is composed of two elements: the fact of damage-injury to plaintiff's business resulting from the alleged illegal conspiracy  and the amount of damages. Once the fact is established, uncertainty concerning the exact amount of loss will not preclude recovery. Story Parchment Co. v. Paterson Co., 282 U.S. 555, 51 S. Ct. 248, 75 L.Ed. 544 (1931); See Fontana Aviation, Inc. v. Beech Aircraft Corp., 432 F.2d 1080 (7th Cir., 1970), cert. den. 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 826 (1971). The concepts of justice and public policy require that a wrongdoer shall bear the risk of uncertainty *858 which his own wrong has created. Toulmin's Anti-Trust Laws at 948 (1951); Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1945). For all that the law requires is that damages be reflected and shown with a reasonable degree of accuracy. Toulmin's Anti-Trust Laws at 949 (1951); See Bigelow v. RKO Radio Pictures, supra.
This Court finds the element of the fact of damage resulting from the defendant's illegal conduct, it now only concerns itself with the amount of damages. The plaintiff's damage claims consist of: (1) lost net profits on sales to Ward's and Shopper's from June, 1969, through September 30, 1972, in the amount of $30,108; (2) lost profits on all milk sales from July 15, 1971, through September 30, 1972, resulting from plaintiff's attempts to compete with defendants' unlawful prices in the amount of $36,645; and advertising expenses incurred in attempting to minimize loss of sales in the amount of $28,950.
In support of the item of lost net profits to Ward's and Shopper's, the plaintiff introduced evidence as to the lost sales and the lost profits by not making those sales. Plaintiff provided figures on its sales to Ward's and Shopper's on a units sold per month basis prior to the introduction of Hyde Park (base period). Plaintiff also provided similar figures on its sales to Ward's and Shopper's subsequent to the introduction of Hyde Park. Then, plaintiff measured its lost sales by subtracting the units sold in each month subsequent to said introduction from the same month during the base period. Lost profits were formulated by subtracting the cost of raw milk, cartons and drivers' commissions in effect for the time from June, 1969, to September 30, 1969 from the wholesale price to Ward's and Shopper's in effect for each item on each day during that period. This total was then multiplied by the aforesaid lost unit sales. The bottom line figures for lost profits on lost sales to Ward's and Shopper's were $20,765 and $9,342, respectively. This Court finds that such amounts have a rational basis and are supported by the evidence. Keogh v. Chicago & N. W. Ky., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922).
To support the item of lost profits on all milk sales resulting from plaintiff's price decreases which were attempts to meet defendants' illegal prices, the plaintiff totalled the gallons and half gallons sold on plaintiff's Cape Girardeau routes from July 5, 1971, to September 30, 1972. As plaintiff's price drop from July 5, 1971, to April, 1972, was 9 cents per gallon and 5 cents per half gallon, then each volumetric unit sold during said period was multiplied by their respective price decrease so as to compute the lost profits. Inasmuch as in April of 1972, plaintiff cancelled 4 cents of its price reduction on gallons and 2 cents of its price reduction on half gallons, then for that period up until September 30, 1972, unit sales were multiplied by 5 cents and 3 cents, respectively, for computation of lost profits. The combined total for Routes 2, 3, 4 and 5 was $36,645. Again, this Court finds that such an amount has a rationale basis and is supported by the evidence.
The third damage item claimed by the plaintiff is advertising expense incurred in attempting to minimize lost sales in the amount of $28,950. However, the Court finds this claim to be unfounded. Though in the years, 1968 and 1969, Sunny Hill's advertising expenses were less than $11,000, these low amounts were due in part to Sunny Hill's poor cash position. In 1964, plaintiff spent nearly $20,000 on advertising. A $30,000 amount for July, 1971 to September, 1972, appears to be but a return to the plaintiff's former level of advertising with the addition of inflationary costs. Accordingly, such damage *859 item does not have a rationale basis and cannot be allowed.

Injunctive Relief
Injunctive relief in private litigation is authorized by Section 16 of the Clayton Act. 15 U.S.C. Section 26. The defendants assert the defense of "unclean hands". However, such defense is not a valid one in an anti-trust action. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S. Ct. 259, 95 L.Ed. 219 (1951); See ABA Antitrust Section, Antitrust Developments: 1955-1968 at 310 (1968). Herein, it has been determined that the defendants have committed acts proscribed by anti-trust laws. Accordingly, each such defendant shall be enjoined from the continuance of such activity.

Attorney Fees
The award of attorneys' fees to a successful plaintiff is sanctioned by 15 U.S.C., Section 15. In arriving at the proper fee, this Court shall consider the following factors:
(1) the fact that plaintiff's counsel has not had the benefit of a prior judgment or decree in a case brought by the government;
(2) the standing at the bar of counsel on both sides;
(3) the time spent by plaintiff's counsel;
(4) the magnitude and complexity of the litigation;
(5) the responsibility undertaken by counsel;
(6) the amount recovered; and
(7) the Court's knowledge of the quality of counsel's work done on the case in and out of Court.[25]
In accordance with the above considerations, plaintiff's counsel will be allowed reasonable attorneys fees after a hearing is held.
NOTES
[1] See text after Footnote 11 for the two agreements in part.
[2] Section 1. Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal; Provided, That nothing contained in sections 1 to 7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions, under any statute, law or public policy now or hereafter in effect in any State, Territory or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: Provided further, That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1 to 7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.
[3] Knuth v. Erie-Crawford Dairy Cooperative Ass'n, 326 F.Supp. 48 (W.D.Pa.1971).
[4] 351 U.S. at 309-310, 76 S.Ct. at 940 (1956).
[5] Arthur Reissen, Zone Sales Manager of the St. Louis District of Sealtest Foods, Division of Kraftco Corporation, testified that:

Q: So your testimony is that Malone & Hyde at the Sikeston meeting, together with the Sealtest people, agreed that these prices would be the prices that Malone & Hyde charged the individual store members, is that correct?
A: In the area specified, yes.
Q: Including the Cape Girardeau area?
A: Yes, sir. If it said Missouri it probably did. T. 666-7.
[6] Sam II. Boehms, General Manager of the St. Louis District of Sealtest Foods, Division of Kraftco Corporation, testified that:

A: I just want to say that we and Malone & Hyde set the price to . . . that goes into that particular store, yes.
Q: Your testimony is here in this Court that you and Malone & Hyde agree between yourselves as to what price Ward's Store No. 51 will pay for the milk, is that your testimony sir? Well, you've said that, haven't you?
A: Yes, I've said that I guess, yes, sir. T. 158.
Arthur Reissen, testified that:
Q: Now, sir, is it your testimony today that you and your Executives agreed with Malone & Hyde as to the price at which they were going to sell the Hyde Park label milk into the store, is that your testimony today?
A: Those prices are listed as such. I'd say yes. T. 666.
[7] Sam H. Boehms further testified that:

Q: Exhibit No. 29 I guess referred, wasn't it Farrar, and I made reference to a letter that went to Farrar, just so there could be no mistake about it. That is the same type of letter directed to Mr. Farrar which sets the price that he charges to Ward's store.
A: I was going to say . . . setting the price, it is telling what the price will be on this product.
Q: Okay.
A: Because the price had been set with Malone & Hyde, the same price we said on the document, yes.
Q: Yes, sir. T. 163.
[8] Albrecht v. Herald Co., supra, wherein it was stated in part that "resale price fixing is a per se violation of the law whether done by agreement or combination." See supra footnote 4.
[9] United States v. Socony-Vacuum Oil Co., supra, 310 U.S. at 222, 60 S.Ct. 811.
[10] Id.
[11] Leo Cavener, Officer in Shoppers Warehouse Market, Incorporated, testified to the following:

Q: And when Malone & Hyde would make, I believe you used the word recommendation or suggestion to you and you thought it best that you not do it, then you followed the dictates of your own conscience rather than what they told you?
A: Not exactly, Mr. Dempster, I would always try whatever was suggested by Malone & Hyde because I felt that they had a greater knowledge of the situation and I would follow their recommendation. I would try it. If it didn't work then I would make a change. But I would try what they suggested first. T. 456-7
[12] Arthur Reissen stated in part the following:

Q: There has been evidence, Mr. Reissen, that there was a meeting down in Sikeston on the 27th day of March, 1969, which you, Mr. Boehms and Mr. Allmon met down at Sikeston. Do you remember being down there?
A: I do.
Q: May I ask if at that meeting there was a discussion about what the out-of-store price of the two products would be if the deal was made?
A: There was no agreement on any out-of-store pricing, sir.
Q: Was there any discussion about an out-of-store price?
A: We from Sealtest ____
Q: Was there discussion about an out-of-store price?
A: We stated ____
Q: No, please, was there discussion? Answer it yes or no.
A: Yes, sir.
Q: Alright. Who discussed it?
A: We discussed it, sir.
Q: Name the people by name.
A: Sealtest.
Q: Who from Sealtest was speaking?
A: I don't know who was speaking.
Q: One of you there?
A: I would say probably Wally I guess.
Q: Just tell the Court what Wally said about the out-of-store price?
A: We were desirous of having Sealtest and Hyde Park priced the same out-of-store.
Q: Is that what Wally said to the Hyde Park people?
A: Right.
Q: What did the Hyde Park people say in response to that?
A: They made no comment.
Q: You mean they didn't say yes or not or anything at all about it?
A: They said neither yes nor no.
THE COURT: By Hyde Park people I assume you mean Malone & Hyde.
MR. RIDDLE: That is correct, Your Honor. T. 658-9
[13] John Moll, Vice-President of Malone & Hyde, Inc., stated in part the following:

Q: I know, but I'm talking about your and Sealtest conversation.
A: That's exactly what I told Sealtest, the store would do whatever he wanted to do with it.
Q: Did you tell them that you wanted and expected to have a differential in the out-of-store price?
A: No, we did not, only in the areas where we had competition that had a differential.
Q: Yes, like in Cape Girardeau?
A: Like in Cape Girardeau, yes.
T. 2712-13
[14] See footnotes 15 and 16, infra.
[15] Auman testified in part to the following:

Q: Was there any conversation at all about out-of-store prices of the Hyde Park milk in relation to Sealtest?
A: Well, they wanted to keep them the same; that is, we wanted to keep them the same.
Q: Did you tell them that?
A: Yes. I didn't but Shannon did.
Q: And what did they tell you?
A: They would try to keep them the same; that is, as long as there was no disruption in the markets.
Q: Was there any discussion about a 2 cents differential in certain depressed markets?
A: Well, naturally if there was a depressed price, why they didn't want to be higher than the rest of the market.
Q: And they told you that?
A: That's right.
Q: But was this agreeable to you?
A: Well, yes. T. 884-5
[16] Shannon, Sealtest General Sales Manager, for the Cape Girardeau area, testified in part to the following:
A: Well, they wanted the program to be successful and we tried to sell them on the idea that they could sell at the same price.
Q: They tell you they wanted a two cents differential out of the store on a half gallon?
A: They thought it would take a differential to sell the program.
Q: You agreed with that?
A: No.
Q: Well, did you not agree with it?
A: Yes, we did not agree with it.
Q: You did not agree with it? But a differential of two cents or more actually developed, did it not?
A: Well, we had no control over it and they didn't either.
See also footnote 20 infra. T. 1805-6
[17] John Moll testified to the following:

Q: Now, if he sold it out of the store at 20 cents what would you expect the other stores here in Cape to do?
A: I'd expect them to come down and meet that price.
Q: And get in one of these price wars that you're talking about?
A: Yes, sir.
Q: And that's the thing that you and Sealtest didn't want to happen, isn't it?
A: Yes, that's the thing Sealtest advised me to guard against, yes, sir.
Q: And did you guard against it?
A: Yes, I did.
Q: How did you go about guarding against it?
A: Asked the stores not to reduce it below what your competition was selling it for, just meet the competition. T. 2706-7.
[18] See footnote 9 supra and text immediately preceding and subsequent to said footnote.
[19] An example of Malone & Hyde's "recommendation" was testified to by John Moll:

Q: Did they discourage you from pricing your private label less than the standard?
A: Yes, sir, they brought this to our attention. They asked us what we would recommend to the stores as far as the out-of-store pricing, the retail pricing of the store, and they advised us that it would be their interpretation not to try to get a milk war started. We certainly agreed with that and said as far as the pricing of the out-of-store situation is concerned, that's up to the individual store, but we'll certainly recommend to the stores not to cut the price of milk. T. 2263
It should be noted that this "recommendation" not to cut the price of milk was followed at least in the pricing of Sealtest and Hyde Park milk.
[20] Cavaner testified to the following:

Q: Was there any negotiation with the Malone & Hyde representative on the price, that is to say did he say price X and the store owner said how about X minus 1 or X minus 2?
A: The price was determined that our private label milk would sell for 2 cents a half-gallon less than the national better-known brands.
Q: That was out-of-store or into-store, sir?
A: No, out-of store price 2 cents a half-gallon differential between private label and the other labels.
Q: Did Mr. Matthews tell you this?
A: I don't know if it was Mr. Matthews, but a representative of Malone & Hyde. T. 303
[21] Id.
[22] Cavaner testified to the following in reference to preferred positions:

Q: Was there any discussion with the Malone & Hyde man  strike that. In your experience as a retail grocer, in a dairy case there is a preferred position in the traffic flow. Is that correct?
A: That is correct.
Q: What is that in the traffic flow, sir?
A: Well the first position or the first item that the customer sees first, that is the preferred position.
Q: And the second is second preferred, is that right?
A: Right. The one at the far end would be the least preferred. T. 302
[23] Cavaner further testified to the following:

THE COURT: What was it and who gave it to you?
THE WITNESS: Well, either Mr. Matthews or one of his representatives of Malone & Hyde.
THE COURT: What did they tell you?
THE WITNESS: They told us that we would receive the Hyde Park label milk along with out Sealtest products and they told us how the space in the dairy case was to be divided among the products, 50 per cent of the case was to be used for the Hyde Park label and 25 per cent of the case for Sealtest, and the remaining 25 percent for any other brands that we carried. T. 302
Cavaner continued:
Q: Did anyone from Malone and Hyde tell you which milks would get the preferred positions in the customer flow?
A: Yes, sir.
Q: Which milk got the best position?
A: Hyde Park is number one.
Q: And what's the number two milk?
A: Sealtest.
Q: And number three is whosever left over, is that right?
A: In our particular case, Sunny Hill. We handled no other brands. T. 304
[24] Rule of causation stated in another fashion is the plaintiff must prove "with a fair degree of certainty, the fact of damage and the causal connection between the anti-trust violation and the injury." ABA ANTITRUST SECTION, ANTITRUST DEVELOPMENTS: 1955-1968, at 282 (1968). Cited in Morning Pioneer, Inc. v. Bismarck Tribune Co., 493 F.2d 383 (8th Cir. 1974). Again, this Court finds the causal connection.
[25] See generally, Comment, Attorney's Fees in Individual and Class Action Anti-trust Litigation, 60 Calif.L.Rev. 1656 (1972); cited with approval in Morning Pioneer, Inc. v. Bismarck Tribune Co., supra.